HOWARD HILL *et al.,* plaintiffs in error, *vs.* AUGUSTUS C. FELTON, defendant in error.

Where the Court is of opinion that there is no patent ambiguity in those parts of a will affecting the property in issue before it, and no latent ambiguity is raised by proof of extrinsic circumstances, the instructions of the testator to the scrivener who drew the will are inadmissible to show that the testator intended to dispose of his property in a mander different from the direction it would take when the ordinary rules of construction are applied to the words of the will.

McCAY, Judge, dissented.

Construction of will. Ambiguity. Evidence. Before Judge CLARK. Macon Superior Court. December Term, 1871.

Shadrach R. Felton died in April, 1852, leaving the following will and codicil:

"STATE OF GEORGIA.—Macon County.

"The last will and testament of Shadrach R. Felton, of the county and State aforesaid.

"In order to dispose of my property in such manner as I consider fair and just among those dear to me by family ties, I, Shadrach R. Felton, do make, ordain and publish, this my last will and testament, with the following provisions, that is to say—

"1st. I give and bequeath to my eldest son, John Micajah Felton, for and during the term of his natural life, five certain negro slaves, to-wit:    *    *    *    and also the use and occupation of the land I purchased from the estate of the late John Rushin, deceased, which said lands lie in the fifteenth district of originally Houston now Macon county, and amounts to nine hundred acres, more or less, excepting the ground on which Montezuma now stands, and the right of way heretofore granted to the Southwestern Railroad Company. It is my particular desire, and I hereby direct that the property bequeathed as above, with its natural increase, shall pass to and become vested in the child or children which my said son, John Micajah, may have at his death, and in the event of the death of my son, John Micajah, without issue, then all of said property shall be equally divided among my other children then living, share and share alike. Should any of my children then be dead leaving issue, the share of the parent shall pass to my grandchildren or grandchild then representing said deceased parent. And I furthermore declare that the control and possession which I hereby give to my son, John Micajah, of the property aforesaid, shall amount to nothing more than a life-estate in the same, and that said property shall not be liable for the debts of my said son, John Micajah, nor shall he part with the title to the same so as to deprive my grandchild or grandchildren, which he may have at his death, of the benefit of said property or any portion thereof, or in

Hill *et al. vs.* Felton.

default of such issue, no act or liability of his shall deprive my other children or their heirs of the absolute right to said property. My sole object in making this restriction, is to secure to my grandchildren that may come after me a substantial token of my love. Should the said John Micajah attempt to sell said ...... or become so involved that the same would likely be seized seized for his debts, I direct that the proper Court having jurisdiction shall appoint a *"prochein ami,"* or next friend, to protect the rights of the remaindermen in the premises in such way as shall be just and equitable. By nothing herein stated am I to be understood as doubting the prudence or integrity of my said son, John Micajah Felton.

"2d. To my beloved wife, Lavenia Felton, I give and bequeath the tract or lot of land on which I now reside, containing two hundred and two and a-half acres, more or less, with all the appurtenances therein, during her natural life or widowhood. Should she marry after my death, it is hoped that a good home will be provided for her by my successor. In the event of her second marriage, the said lot of land is to be equally divided in value among all my children by my said wife.

"3d. After the payment of my just and lawful debts, if any should exist at my death, the balance of my property, consisting of lands, slaves, plantation stock, choses in action and all other things whatsoever, is to be divided equally among my children, that is to say, William Noah Felton, Augustus Cicero Felton and Jane Elizabeth Felton, and such other child or children hereafter to be born, which I may have at the time of my death, or which may be born of my said wife within the usual period of gestation thereafter, share and share alike. If the lands can be divided fairly among said children, I desire that a partition may take place, but should the executors or a majority of the legatees prefer to divide otherwise, then a valuation is to take place and the proper sums awarded. To guard against imprudence or misfortune on the part of all my children, I hereby impose on each of them, and the property herein bequeathed to them respectively the same restric-

tions and regulations hereinbefore applied to my son, John Micajah, and the interest he may take under this will.

"4th. In all my property except my lands, my wife, Lavenia, is to receive a child's part, and no more. Nothing herein is to interfere wi h the right to the possession of the lot of land on which I reside, as hereinbefore provided.

"5th. Such sums of money as I have advanced or may advance to my son, John Micajah, he is to refund to my estate, and the same is to be equally divided among all my children, allowing a child's part to my said wife.

"6th. The proceeds of the land now laid for the town of Montezuma are to be equally divided among all my children, and they are to have a vested and equal interest in said land or town site.

"7th. I appoint John Micajah Felton and Cicero H. Young, executors to this my last will and testament and request the Inferior Court, when sitting for Ordinary purposes, for Macon county, to appoint a suitable person administrator with the will annexed to carry out the foregoing provisions, should the above named executors decline qualifying or resign.

"Hereby revoking any will and wills by me at any time heretofore made, I declare this to be my only last will and testament, containing a true disposition of my property and effects.

"In testimony whereof, I, Shadrach R. Felton, have hereto set my hand and affixed my seal, this seventeenth day of November, in the year of our Lord one thousand eight hundred and fifty-one.    .    (Signed)        S. R. FELTON,    [L.S.]

"Signed, sealed and published by Shadrach R. Felton, as his last will and testament on the day and year above written in our presence, and at his request, and in his presence, and in the presence of each other, we at the same time subscribed our names as witnesses hereto.

(Signed.)            "JOHN R. FELTON,
                     "M. H. COLLINS,
                     "C. H. YOUNG,
                     "STEPHEN F. MILLER."

Codicil to the last will and testament of Shadrach R. Felton.

"STATE OF GEORGIA—Macon County :

"Having on the seventeenth day of November, in the year of our Lord one thousand eight hundred and fifty-one, made my last will and testament of the same, (?) and desiring to change some of the provisions of said will, I, Shadrach R. Felton, do declare and publish this as a codicil to said last will and testament in the words following, to-wit :

"1st. In the first clause of my said will I gave and bequeathed to my son, John Micajah Felton, a life-estate in certain property therein mentioned. Now I revoke so much of said clause as relates to the lands therein specified, and hereby give and bequeath to my said son, John Micajah, all my claim, title and interest to and on the town of Montezuma, and the parcel of land connected therewith, consisting of twenty acres, more or less, which I jointly hold with John T. Brown, and my said son, John Micajah, is to have no portion of any lands except the said Montezuma property, to the extent as aforesaid, and further, my said son, John Micajah, is to pay to my executors all the money or sums that I have advanced to him or paid on his account, except one share thereof, equal to a share, counting my said wife, Lavenia, and all my children, each as a shareholder, which one said share he is permitted to retain for his own use, and no more.

"2d. All my lands thus withdrawn from the provisions of the said first clause of my said will are to be sold by my executors, and the proceeds thereof to be equally divided among my children, share and share alike, including John Micajah.

"3d. I hereby constitute and appoint Cicero H. Young a trustee for all my children, sons and daughters, and vest in him the legal estate in all the property specified in said will, set apart for them, respectively, for their own separate use and benefit. And I hereby authorize and require said trustee and his successors to keep the property of each of my children from waste, and to preserve the same * * * or in such form

as he may deem best for their interest and happiness, allowing to my said children the free use and profits of said property, but not the right to sell or dispose of the same without the consent, in writing, of my said trustee or his successors.

"In testimony whereof, I, Shadrach R. Felton, have hereto set my hand and affixed my seal, this the tenth day of April, in the year of our Lord, one thousand eight hundred and fifty-two.          (Signed.)

"S. R. FELTON,   [L.S.]

"Signed, sealed and published by Shadrach R. Felton, as a codicil to his last will and testament, on the day and year above written, in our presence and at his request, and in his presence, and also in the presence of each other, we at the same time subscribed our names as witnesses thereto.

"A. M. PITTS,
"W. W. DAVIS,
"STEPHEN F. MILLER,
"JOHN R. FELTON."

The will and codicil were admitted to record, and the executors qualified at the May term, 1852, of the Inferior Court of Macon county, sitting for Ordinary purposes.

Carrie Hill, the wife of Howard Hill, was the only child of John Micajah Felton, who died intestate, in the year 1867. Cicero H. Young, the other executor under said will, died in 1862. Howard Hill and wife sought to have administration with the will annexed granted upon the estate of said Shadrach R. Felton, for the purpose of subjecting the property bequeathed in the first item of the codicil of said will to her remainder interest, she claiming that her father, John Micajah Felton, took said property subject to the same limitations and restrictions as were contained in the first item of the will. John Micajah Felton sold his entire interest under the said codicil to Cicero H. Young, as the trustee and guardian of Augustus Cicero Felton, on December 24th, 1853, and the same had been held and claimed as the property of said Augustus Cicero ever since. The Supreme Court held, when

Hill *et al. vs.* Felton.

the construction of this will was before it, that John Micajah Felton took a fee simple estate under said codicil : *Vide Felton vs. Hill and wife et al.,* 41 *Georgia Reports,* 554.

Augustus Cicero Felton filed his bill to enjoin the issuing of letters of administration, *de bonis non, cum testamento annexo,* setting up that the estate had been fully administered, statute of limitations, etc. The defendants filed their answer, admitting the material charges of the bill, but denying the conclusions of law. Upon the trial of the issue formed by this bill and answer, defendants sought to introduce the testimony of Stephen F. Miller, the draftsman of the will, to explain an alleged ambiguity, and to show the intention of the testator as to the estate which John Micajah Felton should take under said will. Upon objection made by complainant, this evidence was excluded by the Court, and defendants excepted. The jury returned a verdict for complainant, and the injunction was made perpetual. Several grounds of error were assigned, but the only one passed on in the decision of the Court was as to the admissibility of the evidence of Stephen F. Miller.

LYON & IRVIN; PHIL. COOK, for plaintiffs in error.

POE, HALL & POE ; NESBITS & JACKSON; W. A. HAWKINS, for defendants in error, submitted the following brief:

1st. This is an attempt to apply the rule of construction laid down in section 2421 of the Code to a will which took effect in 1852, and under which titles had vested and interests in property grown up twelve years before the adoption of the rule. Construction frequently furnishes the rule upon which titles vest, and when this is the case, the rules thus deduced are sacred, and cannot be deviated from or overturned without destroying valuable rights and interests : Goodlittle *vs.* Edmunds, 7 T. R., 640; Cowper R., 834; Ld. Cheyney's case, 5 Rep., 68 (*a*;) 36 Ga. R., 199 ; King *vs.* Leves, 34 *Ib.*, 386 ; Bass *vs.* Ware, 2 Merivale, 241 ; Cholmondely *vs.* Cleaton, 16 Howard, 275 ; Carroll *vs.* Carroll.

2d. It is not contended that this is a "latent ambiguity," and it is not "*patent:*" Castledon *vs.* Turner, 3 Atk., 258; Prest. & Co. *vs.* D. & D. Just, 1 Busbee's Eq. R., 65; 1 Redfield on Wills, ch. 10, sec. 4, pl. 401; Armstead *et al. vs.* Armstead, ex'r., 32 Ga. R., 597. It is rather an attempt to overturn the ordinary rules of construction by a resort to parol testimony, and this cannot be done for the purpose of enlarging or diminishing the estate devised: King *vs.* Ackerman, 2 Black. R., 408; nor when the terms are insufficient of their own force to disinherit the heir: Allen *vs.* Allen, 18 Howard R., 385; nor to show a different intention in the testator from that which his will discloses: Weatherhead's Lessee *vs.* Baskinville *et al.*, 11 *Ib.*, 357; Gallego *vs.* Gallego, 2 Brock. R., 285; nor to show that the terms in a written instrument were used in any unusual and extraordinary sense: Herrick *vs.* Noble, 22 Verm. R., 1. In short, the language of the will cannot be varied, or omission supplied, or *apparent ambiguities removed* by extrinsic evidence addressed directly to that point, nor to show that certain words were intended to create particular estates, or that the testator meant something different from what his language imports. This is clearly the result of all the authorities, both English and American, from Challoner & Bowyers' case, (2 Leonard's R., 70,) and Lord Cheyney's case, down to the present day: 1 Redfield on Wills, 573, note 2; Doe *vs.* Fyldes, Cowper, 833; Miller *vs.* Travers, 8 Bing., 244, (21 E. C. L. R., 288;) Doe *ex dem.* Gord *vs.* Needs, 2 M. & W., 129; Doe *ex dem.* Hiscocks *vs.* Hiscocks, 5 *Ib.*, 363; Heust *vs.* Beech *et al.*, 5 Madd. Ch. R., 351; Smith *vs.* Bell, 6 Peters, 68; Bernasconi *vs.* Atkinson, 17 Eng. Law and Eq. R., 103; Atty. Genl. *vs.* Clapham, 31 *Ib.*, 142; Moon *vs.* Billingslea, 14 Ga. R., 370; Doyal and wife *vs.* Smith, 28 Ga. R., 264; Doe *ex dem.* Tuggle and wife *vs.* Roe & McMath, 38 *Ib.*, 649.

3d. The question as to the construction of this will, so far as respects the estate of plaintiffs in error, is *res adjudicata,* and the parties are estopped from making it here: Felton *vs.* Hill and wife, 41 Ga. R., 554.

Hill *et al. vs.* Felton.

MONTGOMERY, Judge.

The only question necessary to be considered in this case is, are the instructions of the testator to the scrivener who drew his will admissible to explain his intention? It is only upon the assumption that there is an ambiguity in the will, that these instructions are sought to be admitted. It is not pretended that any latent ambiguity has been raised by proof of extrinsic facts, but it is insisted that a patent ambiguity does exist, which may be explained under sections 2421 and 3748 of the Code. It is certain that there is a class of patent ambiguities which may be explained at common law by proof of extrinsic facts: See Cowan & Hill's Notes to Phillips on Evidence, note 269, page 311, 3d Edition. Another class, however, which Lord Bacon styles *ambiguitas patens*, it is said, cannot be so explained. "An ambuiguity is patent in this sense, when the mere perusal of the instrument shows plainly that something more must be added before the reader can determine which of several things is meant by it:" *Ib.* If any ambiguity is apparent in this will, it must be of this last mentioned class, and could not, if the rule quoted be correct, be explained at common law by parol evidence, but would, perhaps, be explainable, if explanation were possible, by such evidence under the sections of the Code relied on. In order to make those sections applicable in cases of patent ambiguities, the perusal of the instrument must "plainly show" the existence of the ambiguity. *Quoties in verbis nulla est ambiguitas ibi nulla expositio contra verba fienda est.* "The general rule," observes a learned Judge, "I take to be, that where the words of any written instrument are free from ambiguity in themselves, and where external circumstances do not create any doubt or difficulty as to the proper application of these words to claimants under the instrument, or the subject matter to which the instrument relates, such instrument is always to be construed according to the strict, plain, common meaning of the words themselves; and that, in such case, evidence *dehors* the instrument for the purpose of explaining it accord-

ing to the surmised or alleged intention of the parties to the instrument, is utterly inadmissible :" Tindal, Chief Justice, in Shore *vs.* Wilson, 5 Scott N. R., 1037 ; see, also, Doe *vs.* Westlake, 4 B. & A., 57.

But it is said that the dissent of Judge McCAY from the interpretation put upon this will by a majority of the Court when it was once before under review, shows that there is an ambiguity existing in the clause under consideration. No one entertains a higher opinion of the legal acumen of my learned colleague than myself; but, as I understand the rule, I must gather the ambiguity from a perusal of the instrument, not from the opinion of others, however learned in the interpretation of instruments they may be. The ambiguity must be apparent to my own mind : Bremriel *vs.* Prothen, 3 Vesey, 113. As I read the instrument, it not only fails to show plainly an ambiguity, but fails to raise a doubt as to the proper interpretation to be placed upon the words of that part of the will under review. There are some parts of this will which do seem ambiguous—the meaning of the testator in using the words, "restrictions and regulations," in the third item of the will, for example. But it is not contended that those parts of the will in any way affect the question in issue in this case Hence, whatever ambiguity may exist as to their meaning, cannot be used to admit evidence to contradict the plain meaning of those parts of the will upon the construction of which the case turns. As I understand the law, however well satisfied I might be of an intention on the part of the testator different from that expressed in the first item of the codicil, yet, under section 2420 of the Code, I would be constrained to give effect to the clause as it stands. I concede that in interpreting a will, the whole must be taken together, and that the scheme of the will proper seems to be to confer a life-estate on the children of the testator—certainly upon John Micajah. But the codicil alters this, and bequeaths " *all* my claim, title and interest to and in the town of Montezuma, and the parcel of land connected therewith," to John Micajah. In this property the testator held an individual moiety in fee simple. If

he gave *all* his title and interest, he gave the fee. It is not contended that any well founded ambiguity can arise out of language so plain; but it is said that, viewing the will and codicil together, it is apparent that only a life-estate is intended to be given to John Micajah, or, at least, a doubt is raised as to what *quantum* of estate the testator meant to give by the codicil, and that, therefore, an ambiguity exists, which, under the sections of the Code referred to, will let in parol evidence to explain it. My understanding of the sections of the Code in question is, that they were not intended to admit parol evidence in every case where the astuteness of counsel can suggest a doubt, but only to admit such evidence as an auxiliary where the rules of construction, as understood before the passage of the Code, failed to enlighten the Court as to the meaning of the instrument, and this, whether the ambiguity was latent or patent.

Viewing this will and codicil as a whole, is there a patent ambiguity plainly apparent as to what interest John Micajah takes under the first clause of the codicil? The first item of the will gives a life-estate, clearly, to John Micajah in the property therein bequeathed, *and restrains alienation.* The third item, possibly, makes the same provision as to the property bequeathed to the other children. The sixth item provides for a division of the *proceeds* of the land laid out for the town of Montezuma among all of testator's children. This is the same property which, in the first item of the codicil, is substituted for the life-estate given to John Micajah by the first item of the will; and it is to be noted, that the character of this property is such that any restriction upon its free alienation would, in great measure, destroy its value. The lots of a newly laid out town should be unencumbered as much as possible, and pass freely from hand to hand, to induce persons to buy and build upon them. The testator, "desiring to change some of the provisions of said will," afterwards makes a codicil, and gives the Montezuma land to John Micajah, by words that certainly convey the fee, unless restrained by the general scope of the will to a less estate. But, as it appears

to me, the whole scheme of the will, by which the testator's children were to take life-estates in their respective shares, with a restraint on alienation, (conceding that such is the scheme of the will as to all the children,) is abandoned and a trustee for the first time appointed, by the third item of the codicil, whose consent to alienation is substituted for the life-estate and restriction contained in the will.

In Doe *ex dem*, Child *vs*. Wright, 8 T. R., 64, the testator gave "all my lands in the county of Essex" to his grandson, and also, "all my *estate* in Ellington" to the same grandson. He had previously devised a life-estate in the same lands to his wife. In almost all the other clauses the testator used the word "estate," which is sufficient to pass a fee. The devise to the grandson referred to was all under one item. It was argued that considering the whole will together, it appeared to be the devisor's intention to give an estate in fee to his grandson in the Essex lands. The Court, declining to hear from the other side, held that only a life-estate passed as to those lands, though it was conceded that the grandson took a fee in the Ellington lands. In the case at bar, a life-estate is given by the will—a fee, by the words of the codicil; and the same argument is used in favor of a conveyance of a life-estate by the codicil, (or, rather, in favor of an ambiguity as to what estate was intended to be given,) that was there relied on to sustain a devise of the fee. The Court there were not sufficiently doubtful as to desire to hear from the other side. Which is the stronger case? See, also, Doe *ex dem*, Ellam *vs*. Westley, 4 Barn. and Cress, 667, where Abbott, Chief Justice, says: "I think that our safest course is to consider the two distinct sections of this will as making two distinct devises." And Bayley, Judge, adds, "it is an old observation that the introduction of the word 'item' shows that the testator is dealing with a new subject, and that the words following apply to that only, and not to the preceding matter, unless the intention that they should do so is plain." The reason is stronger why the words of a will should not be held to apply to a codicil, "unless the intention that they should

Hill *et al.* *vs.* Felton.

do so is plain." It is only by applying the words of this will to the codicil that any argument can be made as to the existence of an ambiguity. A subsequent clause of limitation, as to one subject of devise, cannot be governed by words of introduction, which, though clear, are not connected with, and plainly applicable to that particular subject: Nash *vs.* Smith, 17 Ves., 33; Doe *vs.* Clayton, 8 East, 144; Denn *vs.* Gaskin, Cowp., 661.

Where a patent ambiguity does exist, we have seen that the general rule is said to be that parol evidence is inadmissible to explain it. But that rule, it is also said, must be received with this qualification, viz: "That extrinsic evidence is unquestionably admissible for the purpose of showing that the uncertainty, which appears on the face of the instrument, does not in fact, exist, and that the intent of the party, though uncertainly and ambiguously expressed, may yet be ascertained by proof of facts to such a degree of certainty as to allow of the intent being carried into effect. In cases falling within the scope of this remark, the evidence is received, not for the purpose of proving the testator's intention, but of explaining the words he has used:" Brown's Legal Maxims, 472. Again, it is an elementary principle that claimants under the will have a right to ask the Court of construction to place itself, as nearly as may be, in the position of the testator at the time he executed the will, by proof of his surroundings.

Taking these rules as a guide, and excluding the declarations of the testator for the present, what kind of extrinsic evidence is inadmissible to explain a patent ambiguity? It is difficult to answer this question. Had not the general rule been so long established as to become a maxim, that extrinsic evidence is inadmissible to explain a patent ambiguity, I would say, still leaving out of view the declarations of testator, that in all cases of patent ambiguity extrinsic facts are admissible to explain the ambiguity, where it is of a nature that is capable of such explanation. Mr. Phillips seems to entertain this idea, for he says, "some ambiguities apparent in an instrument do not admit of the application of extrinsic evidence,

and are utterly incurable, and render the instrument void ;" and of this class he says, are the instances given by Lord Bacon, which Mr. Phillips calls ambiguities or uncertainties in the limitations of estates: 2 Phil. Ev., 312. Proof of extrinsic facts could scarcely help such a case.

As an instance of a patent ambiguity which is said not to be capable of explanation by parol, a legacy to one of the sons of J. S., is usually given. But if it is shown by extrinsic evidence that J. S., had but one son, and the testator knew it, the son would take: *Ibid.* "On the other hand," Mr. Phillips continues, "there are cases of apparent ambiguity which do admit of explanation by matter of fact, and in which the Court will give effect to the intention of the party consistently with the words used in the instrument." *Ibid.* An examination of many of the authorities (all to which I had access) referred to as sustaining the rule that extrinsic evidence *is* inadmisible to explain patent ambiguities in a will, shows that the evidence rejected was the declarations of the testator as to what he meant: See Cowan & Hill's Notes to Phil. Ev., part 2, number 271. These stand upon a very different footing from extrinsic facts, as will be presently shown.

Mr. Wigram, in his treatise upon the admission of extrinsic evidence in aid of the interpretation of wills, excludes altogether the distinction between latent and patent ambiguities as a *guide.* He lays it down that for the purpose of determining the object of the testator's bounty, or the subjects of disposition, or the quantity of interest intended to be conveyed by the will, a Court may inquire into every material fact relating to the person who claims to be interested under the will, and to the property which is claimed as the subject of disposition, and to the circumstances of the testator and of his family and affairs: Wigram's Extr. Ev., page 7, 51.

Is not this the correct rule whether the ambiguity be latent or patent? And do the sections of our Code do anything more than establish this as the rule in Georgia, in order to settle the question with us in view of the nice distinctions and

refinements, not to say confusion, to be found in the books upon this subject?

The admission of the declarations of the testator to explain an ambiguity, however, is quite a different thing from the proof of extrinsic facts for that purpose, and has been uniformly refused, at least in England, since the case of Hiscocks *vs.* Hiscocks, 5 M & W., 363, (see Doe *ex dem.* Allen *vs.* Allen, 12 A. & E., 451,) except in a single class of cases, to-wit: where the meaning of the testator's words is neither ambiguous nor obscure, and where the devise is on the face of it perfect and intelligible, but from some of the circumstances admitted in proof an ambiguity arises, as to which of the two or more things, or which of the two or more persons (each answering the words of the will) the testator intended to express. Here arises what Lord Bacon calls an equivocation, and the declarations of the testator are admitted to show which of the two things or persons, each equally answering the description in the will, is meant. The principle above quoted confines the admission of such evidence to the case of a latent ambiguity. But in the case of Doe *ex dem.* Gord *vs.* Needs, 2 M. & W., 129, precisely the same ambiguity arose, with the addition that the ambiguity appeared in the will itself; two persons of the same name having been mentioned as legatees in the former part of the will, but there sufficiently distinguished by the names of their fathers, whereas in the clause under which the controversy arose, one of them was again named as legatee, and no indication given as to which of the two was meant. The declarations of the testator were admitted to show which of the two he intended: Doe *ex dem.* Morgan *vs.* Morgan, 1 C. & M., 255, is to the same effect.

But no extrinsic evidence, much less the declarations of the testator, will be received to introduce new words and a new description into the body of the will itself: Miller *vs.* Travers, 8 Bing., 244. And that is what is attempted here—to introduce new words and a new description of the estate which John Micajah takes, reducing it from a fee to a life-estate. To permit such evidence, would overturn the statute of frauds,

and again open the door to all the evils that that law was intended to prevent. I cannot think that the Legislature meant to give such scope to the sections of the Code relied on by the plaintiff in error. Indeed, they must be read in connection with section 2379, re-enacting in substance the statute of frauds, and so construed as not to emasculate that law. Upon the whole, I am of opinion that no patent ambiguity exists in this codicil as to the estate which John Micajah takes, and no latent one has been raised by proof of extrinsic facts—much less does such an ambiguity exist as would render the instructions of·the testator to the scrivener who drew the will competent evidence to explain it.

The question as to the admissibility of the declarations of the testator to rebut a resulting trust, or to repel the presumption against double portions, or to show a revocation by explaining acts done to that end, or where they are part of the *res gestæ,* or on an issue of insanity, is not here involved.

Judgment affirmed.

WARNER, Chief Justice, concurring.

In my judgment, there is no ambiguity on the face of the testator's will, either *latent* or *patent,* which will authorize the admission of parol evidence to explain it. Whatever may be the difference of opinion as to the legal construction to be given to the words employed by the testator, that does not create an ambiguity, in the sense of the law, which may be explained by parol evidence. It is not competent to raise an ambiguity in relation to the testator's intention by parol evidence, *extrinsic* of the words of the will, and then proceed to explain that ambiguity so raised by the same species of evidence, and that is just what is proposed to be done in this case, after the lapse of twenty years from the date of the execution of the will. A testator's will should be construed according to the legal effect of the words contained therein, when those words are not ambiguous or of doubtful meaning. The intention of the testator must be derived from the plain unambiguous words

Hill *et al. vs.* Felton.

of his will, and not from *extrinsic* parol evidence; otherwise, no man's will can stand—the parol evidence of witnesses after his death will make one for him.

McCAY, Judge, dissented, but furnished no opinion.