### KENOLY et al. v. HAWLEY et al.

No. 10170—Opinion Filed Oct. 4, 1921.

Rehearing Denied Dec. 13, 1921.

(Syllabus.)

1. **Judgment—Lack of Jurisdiction — Setting Aside.**

Where a court has no jurisdiction of either the person or subject-matter, or where it has no power to make the order or judgment challenged, any order that it may make or any judgment or decree that it may render is void and confers no right, interest, or power upon any one who may claim to be a beneficiary thereunder, and may be set aside at any time, either on motion filed in the same cause or by independent action.

2. **Indians—Creek Allotments — Effect of Certificate of Selection—Death of Allottee Before Patent Issued.**

Where an allottee of the lands of the Creek Nation has made selection of her allotment and certificates of selection have issued to her therefor, she has received her allotment notwithstanding the fact she died before patents were issued.

3. **Same—Right to Convey—Ejectment.**

Certificates of selection, in the absence of restrictions on alienation, will support a conveyance and will be sufficient upon which to base an action in ejectment.

4. **Same — Restrictions on Alienation — Nature.**

The restrictions imposed by section 16 of the Supplemental Creek Agreement of June 30, 1902, are on the land. They add no disability to the allottee, but restrict the alienation of the land as land allotted to a member of the tribe or as allotted land descending to his heirs.

5. **Same—Removal of Restrictions—Allotment of Minors—Construction of Statute.**

The exception as to minors in the act of Cong. April 21, 1904, applies to allotments of minor citizen allottees not of Indian blood selected by them or for them as such, but does not apply to allotments allotted to them as heirs or inherited by them.

6. **Same — Inherited Lands — Effect of Death of Allottee Before Removal of Restrictions.**

The fact that the allottee was dead at the time restrictions on alienation were removed does not operate to stay the removal statute and prevent it from running with the land and applying to it in the hands of the heir to whom it may descend, whosoever the heir may be, whether he be a minor or of Indian blood.

7. **Same—Homestead Restrictions.**

Homestead restrictions on allotted lands are personal to the allottee to the extent that upon his death they do not run with the land, but are removed.

8. **Curtesy—Existence of Estate—Title in Indian Territory.**

The act of May 2, 1890 (c. 182, 26 St. 94), put in force in the Indian Territory the common law of England as adopted by the state of Arkansas except as to Indians and their estates. The act of June 7, 1897 (c. 3, 30 St. 83), extended the law to all persons in the Indian Territory irrespective of race, and title by curtesy consummate, as it existed in the state of Arkansas, attaches in favor of the husband to all lands of which his wife died seized.

Error from District Court, Okmulgee County; Mark L. Bozarth, Judge.

Action in ejectment by Isabel Kenoly and another against Sam. L. Hawley and others. Judgment for defendants, and plaintiffs bring error. Affirmed.

James M. Hayes, for plaintiffs in error.

W. W. Noffsinger, A. L. Harris, and Orlando Swain, for defendants in error.

KANE, J. On the 28th day of June, 1917, plaintiffs in error, plaintiffs below, began two actions in ejectment in the district court of Okmulgee county. Parties will hereafter be known as plaintiffs and defendants.

The source of title was the same, the right of recovery the same, and the only difference was as to parties and description of the land. These causes were consolidated in the court below and were heard together. All parties claimed title from the same common source.

Nancy Williams was a Creek freedman citizen, and as such was duly enrolled by the Dawes Commission under the Curtis Act, which became effective on the first day of December, 1898, and was entitled to receive an allotment of the lands of the Creek Nation. By virtue of this act, the Dawes Commission opened an office in Muskogee, Oklahoma, on the first day of April, 1899, and proceeded to allot the Creek lands to those entitled to receive allotments. On the 4th day of October, 1899, Nancy Williams selected a part of her allotment and certificate of selection issued to her for the S. ½ of the S. E. ¼ of section 18, twp. 14 N., range 15 E.

Under the Curtis Act, only the right of occupancy was conferred upon the allottee. But on the 8th day of April, 1900, a treaty was negotiated between the United States and the Creek Nation which was adopted by act of Congress on the 1st day of March, 1901, and ratified by the tribe on the 25th day of May, 1901, and known as the Original Creek Agreement, by section 6 of which all allotments under the Curtis Act were confirmed in fee simple to the allottees.

The Original Creek Agreement superseded the Curtis Act where there was conflict, and provided, among other things, that where a citizen of the tribe had died before receiving his allotment, the lands to which he would have been entitled had he lived, would descend to his heirs and be allotted and distributed to them. Section 7 of said Original Agreement required that each member of the tribe should select from his allotment a homestead of 40 acres, for which a separate patent should issue. This section also provided that lands allotted to citizens should not be incumbered or sold to satisfy any debt or obligation contracted prior to the deed or patent, and that such lands should not be alienable by the allottee or his heirs at any time before the expiration of five years from the ratification of this agreement, except with the approval of the Secretary of the Interior.

On the 26th day of June, 1901, Nancy Williams selected the remainder of her allotment, and certificate of selection issued to her on the same day for the N. ½ of S. E. ¼ of section 12, township 14 N., range 14 E.

Nancy Williams died intestate on the 11th day of October, 1901, and left surviving her as her sole and only heirs, her two daughters, Mary Adams and Janie White, and her allotment descended to them under said Original Agreement, and deeds or patents issued to the heirs of Nancy Williams on the 6th day of August, 1904, under section 28 of said agreement, for said allotment, no deed or patent having been issued to her in her lifetime. Said section is as follows:

"All citizens who were living on the first day of April, 1899, entitled to be enrolled under section 21 of the act of Congress approved June 28, 1898, entitled 'An act for the protection of the people of the Indian Territory and for other purposes,' shall be placed upon the rolls to be made by said commission under said act of Congress and if any such citizen has died since that time, or may hereafter die, before receiving his allotment of lands and distributive share of all the funds of the tribe, the lands and money to which he would be entitled, if living, shall descend to his heirs according to the laws of descent and distribution of the Creek Nation, and be allotted and distributed to them accordingly."

Said allotment consisted of two tracts of 80 acres each, and deeds or patents issued to the heirs for 120 acres surplus and 40 acres as homestead. No homestead was selected by Nancy Williams, the allottee, or by any one for her.

A later treaty, called the Supplemental Creek Agreement, was passed by act of Congress of June 30, 1902, was ratified by the tribe on the 26th day of July, 1902, and was proclaimed by the President of the United States on the 8th day of August, 1902, and took effect on this date. The Supplemental Agreement superseded the Original Agreement where there was conflict, and also the provisions of the Curtis Act that had not been repealed by the Original Agreement where there was conflict.

Section 16 of the Supplemental Agreement superseded section 7 of the Original Treaty, and provided as follows:

"Lands allotted to citizens shall not in any manner whatever or at any time be incumbered, taken or sold to secure or satisfy any debt or obligation nor be alienated by the allottee or his heirs before the expiration of five years from the date of the approval of this Supplemental Agreement, except with the approval of the Secretary of the Interior. Each citizen shall select from his allotment forty acres of land, or a quarter of a quarter section, as a homestead, which shall be and remain nontaxable, inalienable, and free from any incumbrance whatever for twenty-one years from the date of the deed therefor, and a separate deed shall be issued to each allottee for his homestead in which this condition shall appear. Selections of homesteads for minors, prisoners, convicts, incompetents and aged and infirm persons who cannot select for themselves may be made in the manner provided for the selection of their allotments and if for any reason such selection be not made for any citizen it shall be the duty of said Commission to make selection for him. The homestead of each citizen shall

remain after the death of the allottee for the use and support of children born to him after May 25, 1901, but if he have no such issue, then he may dispose of his homestead by will, free from the limitation herein imposed, and if this be not done the land embraced in his homestead shall descend to his heirs free from any such limitation according to the laws of descent herein otherwise prescribed. Any agreement or conveyance of any kind or character violative of any of the provisions of this paragraph shall be **absolutely** void and not susceptible of **ratification in any manner** and no rule of estoppel shall ever prevent the assertion of its invalidity."

On the third day of July, 1902, Mary Adams, a Creek freedman citizen of the Creek Nation, died intestate and left surviving her, as her sole heirs, her husband, Ben Adams, and her three children, Isabel Kenoly, Ada McKay, and James Adams, all of whom were minors of very tender years. Mary Adams died seized and possessed in fee simple of the lands in question, the undivided one-half interest of the allotment of Nancy Williams, her mother, and heretofore described.

Upon the death of Mary Adams, the title to the property in question devolved upon her three children under and by virtue of chapter 49 of Mansfield's Digest of the Laws of Arkansas, which had been put into effect in the Indian Territory by act of Congress of July 1, 1902, c. 1323, 32 Stat. 501.

Ben Adams, the husband of Mary Adams, deceased, and father of her minor child, James Adams, born in lawful wedlock, claimed an estate by courtesy in the deceased wife's estate by virtue of chapter 20 of Mansfield's Digest of the Laws of Arkansas, put in force in the Indian Territory by act of Congress of the 2nd day of May, 1890, and transferred same to W. W. Witten and became the guardian of his minor child, James Adams.

It may be here stated that James Adams died in July, 1916, a minor, unmarried, and without issue, and that whatever interest he may have had in the property in question passed, under the laws of Oklahoma, to his two sisters, Isabel Kenoly and Ada McKay, plaintiffs in this action.

On the 11th day of September, 1906, W. W. Witten and James Adams, by his guardian, Ben Adams, brought an action in equity in the United States Court for the Western district of the Indian Territory at Okmulgee, against Janie White and plaintiffs Isabel Kenoly and Ada McKay, who were minors, and a guardian ad litem was appointed by the court, who represented them in the proceed-

ings. It was sought, in said action, to have the curtesy claimed by Ben Adams in the estate of his deceased wife, Mary Adams, declared and set apart to W. W. Witten, to whom he had transferred it, and to have the land partitioned among the heirs, and commissioners were duly appointed for this purpose. The commissioners reported to the court that they were unable to make partitions of said land without great damage and injury to the owners, and the court accepted this view and on the 30th day of May, 1907, ordered the land sold for partition, and on the 12th day of July, 1907, said land was sold, at which sale defendant Sam L. Hawley purchased a certain part of the land and the Okmulgee Loan & Trust Company purchased the remainder. On the 15th day of August, 1907, said sale was duly confirmed, and on the 16th day of August, 1907, deeds were executed to the purchasers by the commissioners, and they immediately went into possession of the land, and have remained in possession since, except that on the 20th day of October, 1910, the Okmulgee Loan & Trust Company conveyed its interest to John L. Havercamp, and defendant Sam L. Hawley has since said sale conveyed a one-half interest to defendant H. L. Wineland. Defendant Havercamp is in possession, and has been since the date of his purchase.

Plaintiffs were minors during the entire time of the proceedings in the United States Court for the Western district of the Indian Territory, and they now contend that by reason of their minority the land was not subject to sale, that it was restricted land, that the court had no jurisdiction of the subject-matter, that the facts stated in the petition did not constitute a cause of action, and that the order of the court directing a sale and all proceedings had with reference thereto are void.

It will only be necessary to consider the defense of the defendants Hawley, Wineland, and Havercamp; the other defendants having filed no brief, nor disclosed any interest that will not be determined by a determination of the issues joined between the plaintiffs and the above named defendants.

Defendants pleaded, in defense, the judgment of the United States Court for the Western district of the Indian Territory, asserted its jurisdiction, declared its power to make the order of sale and all subsequent orders made therein, and that they were holding the land in question and claiming title thereto by reason of said court proceedings, and that at the time the same were had, the restrictions on the alienation of the

land had been removed by act of Congress of April 21, 1904, which provided as follows:

"And all the restrictions upon the alienation of lands of all allottees of either of the Five Civilized Tribes of Indians who are not of Indian blood, except minors, are, except as to homesteads, hereby removed, and all restrictions upon the alienation of all other allottees of said tribes except minors and except as to homesteads may with the approval of the Secretary of the Interior be removed under such rules and regulations as the Secretary of the Interior may prescribe."

The case was heard in the district court of Okmulgee county on the 19th day of September, 1918, upon paintiffs' motion for judgment on the pleadings, which was overruled. The defendants then objected to the introduction of any evidence, which was sustained and the case dismissed. Plaintiffs have appealed to this court, and assign the action of the trial court as error.

The question of first significance to be determined is: Was the land in controversy restricted land at the time of the court sale, or had the restrictions on its alienation been removed by act of Congress of April 21, 1904? If it is true that the alienation of the land was restricted at the time of the order of sale, the court had no jurisdiction of the subject-matter and its order of sale is void Where a court has no jurisdiction of either the person or subject-matter, or where it has no power to make the order or judgment challenged, any order that it may make or any judgment or decree which it may render is void and confers no right, interest, or powers upon anyone who may claim to be a beneficiary thereunder, and may be set aside at any time, either on motion filed in the same cause or by indep ndent action. Revised Laws Okla. 1910, sec. 5274; Clark v. Holmes, 31 Okla. 164, 120 Pac. 642; Lewis et al. v. Clemens, 21 Okla. 167, 95 Pac. 769; Sayer v. Brown (Ind. T.) 104 S. W. 877; Leforce v. Haymes, 25 Okla. 190, 105 Pac. 644; Wheatland Grain & Lumber Co. v. Dowden, 26 Okla. 441, 110 Pac. 898; Blaine County Bank et al. v. Noble, 55 Okla. 361, 155 Pac. 532; Union Savings Association v. Cummins, 74 Oklahoma, 177 Pac. 901; Phoenix Bridge Co. v. J. G. Street, 9 Okla. 422, 60 Pac. 221; Pyeatt et al. v. Estus et al., 72 Oklahoma, 179 Pac. 42; Caulk et al. v. Lowe, 74 Oklahoma, 178 Pac. 101; Fullerton v. Houpt, 12 Ark. 399; Chaffin et al. v. McFadden, 41 Ark. 42; Crane v. Barry, 47 Ga. 470; Olney v. Harvey, 50 Ill., 453; Foreman v. Carter, 9 Kan. 674; Harvey v. Edmonds, 68 N. C. 243; Mills v. Dixon, 6 Rich. (S. C.) 487; Merrill v. Martin (Ind. T.) 64

S. W. 539. See, also, a long list of cases cited in 23 Cyc. pages 740 and 905.

On the other hand, if the restrictions on the alienation of the land had been removed and it was alienable at the time of the order of sale, then there is no question as to the validity of the proceedings and the superiority of defendants' title.

Nancy Williams, the common source of title, was the allottee of the land in the case. she having made selection of her allotment and two certificates of selection for 80 acres each having issued to her, one under the Curtis Act and the other under the Original Creek Agreement. She, therefore, received her allotment, notwithstanding the fact that she died before receiving patents therefor, her death occurring subsequent to the ratification of the Original Creek Agreement. Reed v. Welty 197 Fed. 419; Welty v. Reed, 231 Fed. 930; Sunday v. Mallory, 237 Fed. 526; Parks et al. v. Love et al., 51 Okla. 197, 151 Pac. 885.

The allottee has been uniformly construed to mean a person who has selected and had set apart for him the land he desires to take in allotment. Bledsoe on Indian Laws, sec. 37, and approved by this court in Parkinson v. Skelton, 33 Okla. 816, 128 Pac. 131.

Certificate of selection, in the absence of restrictions upon alienation, will support a conveyance and will be sufficient upon which to base an action in ejectment. Mullen v. United States, 224 U. S. 448; Ballinger v. Frost, 216 U. S. 240; United States v. Dowden, 220 Fed. (C. C. A.) 277; Sorrels v Jones, 26 Okla. 569, 110 Pac. 743; Bowen v. Carter, 42 Okla. 565, 144 Pac. 170.

It is immaterial in this case that patents for both surplus and homestead issued to the heirs. The land was the allotment of Nancy Williams, selected and received by her, and was subject to the restrictions on alienation provided in section 16 of the Supplemental Creek Agreement of June 30, 1902, which has uniformly been treated by the courts as embodying the restrictions on alienation of lands of the tribe.

However, under this act, it was the land that was restricted, not Nancy Williams. It imposed upon her no disability, but restricted the alienation of the land as land allotted to a member of the tribe, or as allotted land descending to her heirs. Have these restrictions been removed? It was within the power of Congress to remove them, and if it has done so, this action must fail. This question, under the state of facts in the case at bar, has not been decided either by this court or the federal courts, but questions an-

alogous have been decided, which we believe are strongly persuasive of the conclusion to be herein announced.

The exception as to minors in the act of April 21, 1904, applies to allotments of minor citizen allottees, not of Indian blood, selected by them or for them as such, and does not apply to allotments allotted to them as heirs or inherited by them. Plaintiffs in this case are not the allottees; Nancy Williams is the allottee, and they are heirs; hence the undivided one-half interest of the allotment of their grandmother, Nancy Williams, which they inherited from the mother. Mary Adams, is not included in the exception above stated as to the alienation of the allotments of minor allottees. It follows, therefore, that at the time of the order of sale, the restrictions on the alienation of the land in question had been removed, and the United States Court for the Western district of the Indian Territory had power to make the sale and confer title upon the purchaser.

If Nancy Williams had been living on the 21st day of April. 1904. she could have alienated any portion of the land under the provisions of the act of this date, except that portion which had been impressed with the character of homestead. if there was such a portion. The restrictions were on the land, and the fact that Nancy Williams. the allottee, was dead at the time the restrictions on alienation of the land were removed, did not operate to stay the removal statute and prevent it from running with the land and applying to it in the hands of the heir to whom it might descend, whosoever the heir might be, whether he be a minor or of Indian blood. This conclusion is sustained in the case of Parkinson v. Skelton, 33 Okla. 816, 128 Pac. 131, in which Mr. Justice Dunn, speaking for the court, says:

"The word 'allottee,' as used in act of April 21, 1904, chapter 1402, 33 Statutes at Large, 204, refers to the parties to whom an allotment is made, and not to their heirs; and where the allottee under the said act would have been authorized to alienate his land, had he lived, the same, on his death, was alienable by his heirs without reference to their blood."

The facts of the case above disclose that C. C. Belcher, a white man, having been adopted and enrolled as a citizen of the Creek Tribe of Indians, died in 1900, after having selected his allotment and received certificates of selection therefor, but before receiving patents. He left surviving him, as his sole heirs, certain mixed-and full-blood Indians, to whom patents issued for both homestead and surplus. These heirs conveyed the land by warranty deed before the five-year period of restrictions on alienation had expired.

In Parks et al. v. Love et al., 51 Okla. 197, 151 Pac. 885, Peggy Phillips, a Creek freedman citizen, selected an allotment of the lands of the Creek Nation and received certificates of selection therefor, designating 120 acres as surplus and 40 acres as homestead. Before receiving her patents, and on the 20th day of August, 1903, she died and left surviving her, as her sole heirs, Willis Love and Robert Jones Love, Indians by blood, who were sons of Robert Love, her deceased half-brother. Willis Love and Robert Jones Love, before the five-year period of restriction on alienation had expired, as in the case of Parkinson v. Skelton, supra, sold the land to C. F. Parks and conveyed the same to him by warranty deed both as to surplus and homestead; and upon this state of facts, Mr. Commissioner Rittenhouse, speaking for the Commission, which was adopted and approved by the court, said:

"Under the provisions of this act, Peggy Phillips, if living on April 21, 1904, could alienate any portion of her allotment, except that portion which would be impressed with the homestead character. In the instant case, the lands were not impressed with the quality of a homestead, and the heirs of Peggy Phillips had the legal right to sell and dispose of the lands in question free from any restrictions." Parkinson v. Skelton, 33 Okla. 813, is also cited and approved.

The only distinction between the above cases and the case at bar is that heirs in those cases were Indians by blood, while in the instant case they were minor Creek freedmen citizens. If there are no restrictions on alienation of allotments inherited by Indians of the blood, there certainly can be no restrictions on the alienation of allotments inherited by minors. They are both included in the same section of the act of April 21. 1904, removing restrictions on alienation, and in the same connection, are of the same class, and fall within the same general purpose of the act, and its construction as to one applies as to the other.

Plaintiffs say, however, that if the restrictions were removed as to the surplus, they were not removed as to the homestead. Under the facts of this case, no homestead right attached and no part of the allotment of Nancy Williams became impressed at any time with the homestead character. Homestead restrictions on alienation of allotted land are personal to the allottee to the extent that upon his death they do not run with the land, but are removed. Mullen v. United States, 224 U. S. 448; Parkinson v.

Skelton, 33 Okla. 813, 128 Pac. 131.

Under section 7 of the Original Agreement, act of March 1, 1901, or under section 16 of the Supplemental Agreement, act of June 30, 1902, which are practically the same and which are a part of the general scheme of allotment for living allottees, homesteads were to be selected by or for allottees who were living, not dead ones nor the heirs of deads ones.

In the case of Parkinson v. Skelton, 33 Okla. 813, it was held that there could be no object in selecting a homestead for a dead man. Nor could there be any object in selecting a homestead for his heirs. If they were allottees, they had homesteads of their own. If not, the law was not intended for them or their protection.

In Rentie et al. v. McCoy et al., 35 Okla. 77, 128 Pac. 244, Scott Rentie, as found by the court, was a minor Creek freedman citizen and died July 2, 1899, before receiving his allotment, and the same was duly allotted to his heirs, who were his father and mother, Morris and Katie Rentie. On April 8, 1905, Morris and Katie Rentie sold said allotment and executed warranty deed covering the same. Mr. Justice Williams, in delivering the opinion of the court, said:

"Obviously the homestead descends at the death of the allottee, where no will has been made, according to the laws of descent prescribed in said act, free from any limitation against alienation."

In the case of Parks et al. v. Love et al., 51 Okla. 197, 151 Pac. 885, under the facts found in that case and as heretofore stated, the court in considering the question of homestead held that the homestead quality did not attach, and that the whole allotment descended to the heirs free from any and all restrictions on alienation.

In the case of Iowa Land & Trust Co. et al. v. Dawson, 37 Okla. 593, 134 Pac. 39, Minnie Hawkins, a Creek freedman citizen, was born March 19, 1901, and died March 2, 1902. An allotment was selected for her, and patent for homestead executed on January 28, 1904, and for surplus on January 20, 1904. Upon this state of facts Commissioner Robertson, in an opinion which was adopted and approved by the court, held:

"Act of Congress approved April 21, 1904, c. 1402 (33 St. at L. 189), removed all restrictions on the allotment of Minnie Hawkins mentioned in the foregoing paragraph, and her heirs could convey good title thereto after the passage of said act, notwithstanding the provisions of section 16 of the Supplemental Creek Agreement."

The final question to be considered is the question of curtesy of Ben Adams in the estate of his deceased wife, Mary Adams. The wife died seized and with issue born alive, and if the right of curtesy existed under the law in force, her estate was subject thereto.

In the case of Johnson et al. v. Simpson, 40 Okla. 413, 139 Pac. 129, Mr. Justice Kane, speaking for the court, said:

"Upon the passage and approval of act of May 2, 1890, c. 182, 26 St. 94, which extended over and put in force in the Indian Territory the common law of England as adopted by the state of Arkansas, with the proviso excepting Indians and their estates, and act of June 7, 1897, c. 3, 30 St. 83, which provided that such laws should apply to all persons of Indian Territory, irrespective of race, and the Curtis Act of June 28, 1898, c. 517, 30 St. L. 495, which provided that the laws of Indian Tribes should no longer be enforced, title by curtesy consummate, as it existed in the state of Arkansas, attached, in favor of the husband, to all lands of which the wife became seized during coverture."

This case has been followed and the doctrine announced therein reaffirmed in the cases of Pierce et al. v. Ellis et al., 51 Okla. 710, 152 Pac. 340; Morris v. Sweeney, 53 Okla. 163, 155 Pac. 537; Bridges v. Wright, 56 Okla. 10, 155 Pac. 883; Miles v. Miles 73 Oklahoma, 175 Pac. 222. It follows that the right of curtesy of the husband, Ben Adams, under the Arkansas statute then in force must be sustained

The judgment of the trial court is in all things afffirmed.

HARRISON, C. J., PITCHFORD, V. C. J., and JOHNSON, MILLER, KENNAMER, and NICHOLSON, JJ., concur.