Farrington vs. Wilson and others.

---

FARRINGTON vs. WILSON and others.

*Guardian's sale—Patent, restriction in—Statutory construction—Taxation.*

1. A patent of land situated in this state, issued by the United States to one of the tribe of Winnebago Indians, in pursuance of a treaty made with them, declared that the land was " not to be leased or sold by the grantee to any person or persons whatever, without the permission of the president of the United States." *Held,* that the restriction was valid, and a conveyance made by the grantee in contravention thereof was void.

2. Such restriction was, however, personal to the grantee, and did not bind his heirs.

3. Subd. 7, sec. 4, ch. 18, R. S., exempts from taxation " the property of all Indians who are not citizens, except lands held by them *by pur*

Farrington vs. Wilson and others.

*chase.*" *Held*, that the lands reserved by the treaty to one of the members of the tribe, and subsequently patented by the United States to him (he not being a citizen), were not held "by purchase" within the meaning of the provision, and were exempt from taxation.

4. The word "purchase" in said section must be taken to mean an acquisition of land *for a valuable consideration:* (1.) Because that is its common or popular acceptation. (2.) Because there are no lands belonging to Indians not citizens, except those held by gift or donation from the Indian tribes with the assent of the United States government, to which the exemption can reasonably be supposed to have been intended to apply.

5. If it was the intention of the statute to subject such reserved lands to taxation, it would be invalid in that respect, as in violation of the constitution and laws of the United States and its treaties with the Indian tribes.

6. Where one who claims to be the guardian of infant heirs owning lands in a county of this state, on applying to the probate court of said county for license to sell said lands, filed, in the manner prescribed by statute, an authenticated copy of his appointment as such guardian by a probate court of Minnesota, and the record of the Wisconsin probate court recites that he was such guardian, duly appointed, and in all other respects shows regular proceedings upon such application, terminating in the making and confirmation of such sale, this is *prima facie* proof of the validity of the sale; especially under chapter 127, laws of 1861, which creates in favor of the jurisdiction of the probate court and the validity of its proceedings, the same presumption which exists in regard to courts of general jurisdiction.

7. The burden of showing that such foreign letters of guardianship were void, rests upon the party who attacks the sale on that ground.

8. Even though the transcript of the proceedings of the Minnesota probate court (put in evidence by the party attacking the sale) failed to show that such minor heirs, at the time of such appointment, were residents of the proper county in Minnesota to give the court jurisdiction to appoint such guardian, yet, as it discloses no facts showing a want of jurisdiction, the record must be taken as *prima facie* authoritative and valid ; and the proceedings in the Wisconsin court being regular on their face, the presumption is in favor of its adjudication, and the party contesting the sale must show positively that the Minnesota court had no jurisdiction to appoint such guardian.

9. In the present case, however, the letters of guardianship (which are a part of the record) recite the fact that such minor heirs were residents of the proper county in Minnesota; and this is sufficient, although the petition, order of appointment, etc., contain no such recital.

10. The fact that such alleged wards were members of an Indian tribe, recognized as a distinct nation of people, does not invalidate such appointment of a guardian; the probate courts of a country having power to appoint guardians for persons resident therein who have a different nationality, as well as guardians for the property situated therein of persons who are residents and citizens of a foreign country.

APPEAL from the Circuit Court for *Dane* County.

Action for the recovery of real estate situated in that county, to which the plaintiff claims title in fee. The defendants deny generally the allegations of the complaint, and claim title in themselves.

To sustain his title, the plaintiff offered in evidence the treaty made August 1, 1829, between the United States and the Winnebago tribe of Indians, by the fifth article of which the United States agreed to grant to Antoine Grignon, a half breed member of that tribe, one section of land, "the same not to be leased or sold by said grantee to any person or persons whatever, without the permission of the President of the United States;" also a patent of the land in controversy issued by the United States to said Antoine Grignon, his heirs and assigns, October 25, 1845, which refers to that treaty and contains the same restriction. He also introduced several depositions, showing that Antoine Grignon and his wife were of mixed blood, and lived for some time in Minnesota, with, and as acknowledged members of the Winnebago tribe of Indians; and that he died at Prairie du Chien about the year 1855, leaving his widow, Harriet, and three children, Virginia, Theresa and Henry, aged respectively, about 15, 8 and 4 years, who continued to reside in Minnesota. He then read from the records of the probate court of Dane county, authenticated copies of letters of guardianship, issued by the probate court of Ramsey county, Minnesota, to George Culver, appointing him guardian of " Henry and Theresa E. Grignon, minors, residing in Ramsey county," and of other papers relating to such guardianship; also the proceedings in such probate court for Dane county for the sale

of the land in controversy by said guardian, and the report of sale and confirmation thereof, and order to convey. He then produced a deed from said George Culver as guardian to Reuben B. Galusha, dated April 29, 1864, and approved by the President April 25, 1865; also a deed from Galusha and wife to himself, dated July 28, 1865; also a deed from Virginia Grignon to himself, dated November 6, 1863, approved by the President April 25, 1865; also a deed from Harriet Grignon to himself, dated October 31, 1863; all of which evidence was received under defendants' objections.

It was admitted that the land was unoccupied, but that defendant *Wilson* had taken some measures to protect the timber growing on it.

The defendants offered in evidence a deed of said land from Antoine Grignon to Daniel M. Brodhead, dated September 21, 1838, and recorded June 10, 1843, which was not approved by the President, and a deed from Broadhead to the defendant *Wilson*; also, a tax deed, executed by the clerk of the board of supervisors of Dane county, to W. W. Treadway, April 13, 1863, and recorded April 18, 1863; all of which were objected to by plaintiff, and were ruled out. He then proved that there were no Indians in that part of the country where the land lay, and had not been for many years.

A jury having been waived, the action was tried before the circuit judge, who found the entire title and right of possession to be in the plaintiff, and judgment was thereupon entered in his favor, from which the defendants appealed.

The case was first heard at the January term of this court in 1870, but was re-argued and decided at the January term, 1872.

*C. T. Wakeley* and *W. F. & H. Vilas*, for appellants:

The deed from Grignon to Brodhead, if not invalid for want of the President's approval, passed the title to Brodhead. *Quinney v. Denney*, 18 Wis., 485. 1. The restriction in the patent was void, because repugnant to the grant of an absolute fee, and because, when the fee passed from the United States to

the patentee, the mode and power of alienation thereafter became subject solely to the laws of the state, under which such restriction would be held void. *Sitzman v. Pacquette*, 13 Wis., 291; *Blackstone Bank v. Davis*, 21 Pick., 42; *Hall v. Tufts*, 18 id., 455; 4 Kent's Com., 5; Const., of Wis., art. I., sec. 14. The law of real property in all its parts is peculiar to the states, and the courts of the United States look to the statutes and decisions of the states for the law controlling titles of individuals. *Lowry v. Weaver*, 4 McLean, 82. The general government cannot, after parting with its fee, still retain a control over the property, in contravention of state law, by the insertion of a condition which, not working a forfeiture if broken, has no effect unless the effect of law. Opinions of Att'ys Gen'l, vol. 4, p. 530. Even if the restriction is valid, the plaintiff's judgment must be reversed, because it is for the whole premises, and he has not established his title to the *whole*, the widow's deed to him not having been approved by the President at all, nor that of Virginia to him approved during her life time, so as to be valid or to be legally delivered. *Gardiner v. Tisdale*, 2 Wis., 153; *Stevenson v. Howard*, 3 Har., and Johns., 554; *Chicopee Bank v. Chapin*, 8 Met., 43; *Jackson v. Leak*, 12 Wend., 105; *Stillwell v. Hubbard*, 20 id., 44; *Baldwin v. Maultsby*, 5 Iredell, 505. The natural interpretation of the restriction is, that the President's permission should be obtained before or at the time of the sale and conveyance. *Doe v. Beardsley*, 2 McLean, 412. 3. Neither has the plaintiff established the heirship of Henry and Theresa Grignon. The guardianship records from Minnesota do not speak of them as children of Antoine Grignon, and, if they did, would not be sufficient proof of that fact. *Potter v. Washburn*, 13 Vt., 558. There having been no adjudication of their heirship, the plaintiff should be required to prove it. *Robards v. Wolfe*, 1 Dana, 155; *Nelson v. Whittall*, 1 Barn. & Ald., 21; Greenl. Ev. (Redfield's), § 575 and notes. 4. The tax deed offered in evidence is good on its face; and if the land was taxable, it is valid, and the plaintiff was not en-

titled to judgment. There is nothing in the treaty, or in the constitution or laws of the United States to prevent unlimited control by the state over Indian lands. If not expressly exempted, the land was taxable. Const. of Wis., art. VIII., sec. 1; *Blue Jacket v. Commissioners, etc.*, 3 Kans., 299. The statute (subd. 7, sec. 4, chap. 18, R. S. 1858,) exempts "the property of all Indians who are not citizens, *except lands held by them by purchase.*" Technically, title by purchase is acquisition by any means whatever except descent. In common parlance, it is acquisition for a valuable consideration. 2 Bouv. Law Dic., Title "Purchase;" 2 Black. Com., 241; Williams Real Prop., 92. The technical meaning is always to be given to such words in a statute, unless the intent to have them understood in some other sense is manifest. Sedgwick on Stat. and Con. Law, 261. Lands acquired by patent from the United States are acquired by purchase. The exemption of the statute was intended to apply to lands occupied by the tribe in a body, or in contiguous districts, and generally, in common.

*Stevens & Flower*, for respondent.

The defendant's exception is to that part of the finding which is a conclusion of law, necessarily resulting from the findings of fact, and not to the finding of facts; therefore the court cannot review the testimony: *Fisher v. Farmers' Loan and Trust Company*, 21 Wis., 73; *Smith v. Coolbaugh*, id., 427; *Gilman v. Thiess*, 18 id., 528; *Taft v. Kessel*, 16 id., 273. The tax deed to Tredway was void, because the land was not subject to taxation. The title in 1859, was in the Indian heirs of Antoine Grignon, by descent and not by purchase. It was not held by Antoine himself by purchase, within the meaning of the statute, the term being there used in its common and not its technical and obsolute signification. A state law declaring it subject to taxation, would have been in conflict with the constitution of the United States, and therefore inoperative and void. *The Kansas Indians*, 5 Wall., 737; 3 Kans., 356; *The New York Indians*, 5 Wall., 761, and other cases; 6 Peters, 515. The deed

to *Brodhead*, was properly excluded, not having been approved by the President. The restriction in the treaty and patent was valid and operative. Laws of New York, 1843, ch. 87, p. 62; *Goodell v. Smith*, 20 Johns., 693; *Gilbert v. Wood*, 7 Johns., 290; *Lee v. Glover*, 8 Cow., 189; *Ogden v. Lee*, 6 Hill, 546; *St. Regis Indians v. Drum*, 19 Johns., 127; *Gillett v. Stanley*, 1 Hill, 121; *United States v. Clarke*, 9 Peters, 169; *Stevens v. Smith*, 2 Kansas, 242; *Whitecrow v. Whitewing*, 3 id., 276; *Harris v. Doe*, 3 Ind., 494; *Lobdell v. Hall*, 3 Nevada, 507; *Halloway v. Buck*, 4 Littell (Ky.), 293; *Herring v. McElderwy*, 5 Porter (Ala.), 161; *Jones v. Mardis' heirs*, id., 327; *Graham's Lessee v. McIntosh*, 8 Wheat., 543; *Godfrey v. Beardsley*, 2 McLean, 412; 4 McLean, 82; 1 Cal., 254; 1 La. Cond. R., 433. The personal disability to convey without the President's approval terminated with the death of Antoine Grignon. The county court had jurisdiction of the proceedings for the guardian's sale, and the purchaser acquired the full interest of the minors. *Sitzman v. Pacquette*, 13 Wis., 291; *Brashear v. Williams*, 10 Ala., 633; *Lowry v. Weaver*, 4 McLean, 82; 1 Iowa, 575.

Upon re-argument, the counsel for the respondent, in support of the position that the deed to Brodhead was invalid and properly excluded, cited the following additional authorities: 10 How. (U. S.), 442; 9 Peters, 711; 4 Humph. (Tenn.), 223; 3 Porter, (Ala.), 403; id., 362; 6 Ohio, 421; 5 How. (Miss.), 178; 11 S. & M., 425; 12 id., 427; 17 Wend., 531; 5 id., 532; 8 Ind., 12; 3 id., 494; *North v. Wendell*, 22 Wis., 431; *Orton v. Noonan*, 23 id., 102; 15 Johns., 264. They further argued that the rule prohibiting restrictions upon alienation in grants in fee did not apply to the case of aliens, or persons, such as Indians, who are not citizens; but it is competent for the government to affix such conditions by contract with such parties. U. S. Const., art. VI., sec. 2. But the clause prohibiting a sale without the approval of the President, is not a restriction upon alienation, but a mere personal disability. It does not follow the fee, but

ceases at the death of the grantee. 8 Cow., 189; 3 Kans., 354. The grant was to Antoine Grignon and his heirs. As he had no citizen heirs, his Indian heirs were doubtless intended by the parties. See *Goodell v. Smith*, 20 Johns., 693. As the Indians have no laws relating to descent of real property, the laws of the state where the land is situated would apply, and govern the descent and alienation thereof. The presumption of law is, that the probate court of Ramsey county, Minn., had acquired jurisdiction of the minor heirs of Grignon, and that Culver was duly appointed guardian, and there can be no doubt that the county court of Dane county acquired jurisdiction in the premises. There is nothing in the treaty imposing citizenship upon Grignon, or from which it can be inferred that his land was rendered subject to all the laws of the state affecting lands, so as to render it liable to taxation. It evidently could not have been the intention of the parties that it should be so liable. 20 Johns., 721–725. See Winnebago treaties, and ordinance of 1787, for the government of the territory northwest of the Ohio. That ordinance is still in force. *Milw. Gas Co. v. Gamecock*, 23 Wis., 144. When the attempt to tax the land was made, it had passed to the heirs of Grignon, who held by descent, and not by "purchase."

DIXON, C. J. The validity of the restriction found in the treaty, and contained in the patent of the land by the United States to Antoine Grignon, "not to be leased or sold by the grantee to any person or persons whatever without the permission of the President of the United States," is unquestionable. The law on this subject is thus summed up by the supreme court of the United States in a recent case: "With respect to the public domain the constitution vests in congress the power of disposition, and of making all needful rules and regulations. *That power is subject to no limitations. Congress has the absolute right to prescribe the times, the conditions, and the mode of transferring this property, or any part of it, and to designate the person to whom*

*the transfer shall be made.*   No state legislation can interfere with this right or embarrass its exercise; and to prevent the possibility of any attempted interference, a provision has been usually inserted in the compacts by which the new states have been admitted into the Union, that such interference with the primary disposal of the soil of the United States shall never be made." *Gibson v. Chouteau* (unreported).   Such a provision is contained in the constitution of this state (Const., art. II., sec. 2), and was inserted in pursuance of the proviso to the 5th subdivision of section 7 of the enabling act, which reads as follows: *"Provided,* that the foregoing propositions herein offered are on the condition that the said convention which shall form the constitution of said state shall provide, by a clause in said constitution or an ordinance, irrevocable without the consent of the United States, that said state shall never interfere with the primary disposal of the soil within the same by the United States, nor with any regulations congress may find necessary for securing the title in such soil to *bona fide.* purchasers thereof; and that no tax shall be imposed on lands the property of the United States; and that in no case shall non-resident proprietors be taxed higher than residents."  1 Taylor's Statutes, 84.   This disposes of the supposed conveyance from Antoine Grignon, the reservee under the treaty, to Daniel M. Brodhead, dated September 21, 1838.   That deed was not only not approved by the President, but was executed some years before the patent to Grignon was issued.

The question as to the liability of the land to taxation, or the proposition that it was not so liable, seems a very plain one upon the language of the statute itself.   The provisions of the statute then in force and involved in this inquiry, were as follows:

" Section 1.  All property, real and personal, within the state, and not expressly exempted therefrom, shall be subject to taxation in the manner provided by law."

" Section 4.  The following property shall be exempt from

taxation: * * * 7. The property of all Indians who are not citizens, except lands held by them by purchase." (R. S. 1858, ch. 18.)

The relation of Grignon and his heirs to the Winnebago tribe or nation of Indians — the fact that they were Indians of mixed blood, belonging to and residing with that tribe, and so known and recognized by the proper authorities of the United States — is well established in evidence.

The question of statutory construction thus presented, and which turns chiefly upon the meaning of the word "*purchase*," as used in the statute, is very fairly stated in the brief of the learned counsel for the defendants, who argues for the taxability of the land. He says: " Title by purchase is defined to be in its *technical sense*, ' the acquisition of real estate by any means whatever, except descent.' It includes title by gift or devise. In a more limited sense, *as used in common parlance, not* in its *technical sense, purchase* is the acquisition of lands *for a valuable consideration.*"

It thus appears from the brief of the counsel, not only that the word " purchase " is and may be used in different senses, but the learned counsel has also very accurately pointed out what those senses are. Now as it cannot for one moment be contended that the acquisition of the title by Grignon from the United States under the stipulations of the treaty, was a " purchase " by him *for a valuable consideration,* or that it was any thing more than a mere gift or reservation by his tribe to him, stipulated and provided for when the treaty was made ceding the lands of the tribe to the United States, it becomes very important to know in which of these different senses the word was employed by the legislature in the statute in question. If it was employed in its *technical sense,* then it is very clear that the legislature intended to tax the land in question, provided it possessed such power. On the other hand, if it was employed in the sense as used and understood in *common parlance,* or in its *popular* sense, then it is very clear the legislature did

not intend to impose the tax. In which sense, then, was the word employed? A fundamental rule, found in all the books, and by which the courts have ever been governed in the construction of statutes, that, in the absence of any thing clearly showing the contrary intention, the words of a statute are to be construed according to their ordinary and popular meaning and use, furnishes a ready answer. "The words of a statute," says Mr. Dwarris, "are to be taken in their ordinary and familiar signification and import, and regard is to be had to their general and proper use; for *jus et norma loquendi* is governed by usage; and the meaning of words spoken or written, ought to be allowed as it has constantly been taken: '*loquendum est ut vulgus?*' But if the usage have been to construe the words of a statute contrary to their obvious meaning by the vulgar tongue, and the common acceptation of terms, such usage must not be regarded; it being rather, say the books, an oppression of those concerned (to force upon them a conventional meaning), than a construction of the statute. And, though, where the words of a statute are doubtful, general usage may be called to explain them, for *optimus legum interpres est consuetudo*, usages that can control the words of an act of parliament must be universal, and not the usage of any particular place." Potter's Dwarris, 193. The words of the above learned author, stating a rule which is as true and applicable now as it was when he wrote them, are enough upon this point. They establish that the word here is to be taken according to its ordinary and familiar signification and import, and not in any technical and unfamiliar sense, which is also the rule prescribed by the statute. R. S., ch. 5, sec. 1, subdivision 1.

But there are other considerations arising upon the language of the statute, which seem to lead almost irresistibly to the same conclusion. The words of the exemption are: "The property of all Indians who are not citizens, *except lands held by them by purchase.*" These words imply most clearly that, in contem-

plation of the framers, there were some lands held by Indians, but *not* "by purchase," in the sense in which those words were used in the statute, which were to be exempt from taxation. What were those lands held by Indians but not "by purchase" in the statutory sense, which it is obvious the legislature intended to exempt? Counsel at the bar argued that it was those lands within the state held in common by the Indian tribes as hunting grounds, and by their original title and right of possession, and which had never yet been ceded to the United States. The incorrectness of this position seems too obvious to admit of serious refutation. No state government ever dreamed of taxing such lands, or that it was necessary to protect them by specific exemption from the operation of any law which its legislature could pass. It was totally incompetent for the legislature of this state, under the constitution of the United States, and that of this state, to tax such lands. They were never regarded as taxable anywhere. Such lands, subject to the Indian right of occupancy, which the government of the United States alone has the power to extinguish, are a part of the public soil and domain of the United States, over which, by the articles of compact, above referred to, between this state and the United States, this state forever relinquished and surrendered all right and privilege of disposition and control.

It cannot, therefore, be that it was such lands it was intended to exempt; and if not, then the conclusion is most strong that it was lands held precisely as the land here in suit, *by gift or donation* from the Indian tribes under the treaty-making power and at the time of ceding their lands to the United States, of which it was known there were quite a number of sections in different parts of the state. The lands not held "by purchase" in the usual and popular sense of those words, that is, the lands held as these were, by gift or donation from the original Indian tribes, with the assent of the government of the United States, and by patent from that government, must have been those

intended to be exempted, or otherwise the legislature did not intend to exempt any of the lands belonging to Indians who were not citizens, over which the state possessed, or was supposed to possess any power of taxation at all. The latter construction seems manifestly contrary to the plain intent and meaning of the statute, and therefore inadmissible. We are bound to suppose, from the context and form of expression adopted, that the legislature intended to exempt some lands belonging to Indians, over which it had, or might be supposed to have had, some claim or semblance of the power of taxation; and yet, if we understand the word "purchase" in the sense contended for, that is, in the technical sense, we destroy this idea altogether. Give the statute this construction, and the legislature intended to tax all lands belonging to Indians, over which it had any shadow of power or jurisdiction, which is clearly a repugnant intent.

On the other hand, give it the construction above indicated, and we give force and effect to all the words, and at the same time carry out the obvious intent and purpose as appears from the entire provision. An Indian who has so far learned the ways of the white race, and adopted their habits of thrift and economy as to be able to buy land and pay for it, as some of them have done, will probably by the same means have sufficient money and business sagacity to care for and pay the taxes which may be assessed upon it. The lands of such Indians were regarded as the proper subjects of taxation, and it was such lands, and such alone, "held by them by purchase," that were intended to be taxed by the exception appended to the exemption clause. As to the class of lands here in controversy, held by members of the tribes far removed to their homes west of the Mississippi river, and as a gift from their people by the grace and favor of the government of the United States, and under the guardianship and protection of the President, it seems manifest that the legislature did not intend to tax them, even if it had possessed the power. It would have been unbe

coming the representatives of a just and magnanimous people, as the people of Wisconsin are, thus to have taken from these, at best, most unfortunate persons, the small and inconsiderable patrimonies so saved to them by their tribes, which, if taxed at all, must have gone for the first paltry sum levied. The reservees were absent from the state, in distant and inaccessible places, to which the tribes had been removed. They were not at liberty to return to the state, and other modes of communication were most difficult, if not impossible; and, more than these, they were most ignorant and poor, possessing neither the intelligence nor the means to pay the assessments, if made. The state was in no need of revenues derived from such a source, and a liberal construction is not to be adopted for the sake of obtaining them. Such taxation was never intended.

The foregoing considerations are offered upon the construction of the statute itself, and to show that the lands of this Indian patentee and his heirs were never intended to be taxed. It would be easy, however, to go further, and to show that, under the constitution and laws of the United States and the treaty making power, and according to the generous and humane policy always pursued by the national government as manifested by the action of all its departments, legislative, executive and judicial, towards peaceful and friendly Indian tribes and their individual members, the state had no power to levy such taxes. It would be easy to show by the decisions of the federal supreme court, several of which were referred to in argument, that such power does not exist. It would be still easier to show how utterly repugnant the exercise of such power would be to the terms and spirit of the treaty by which this land was reserved and patented — how contrary to the intention and policy of the general government thereby indicated. Of what utility the restriction upon the Indian's right of alienation, of what value the guardianship and control of the President, if the title to the land could be taken and passed regardless of the will of the President or any one else, for the first

insignificant tax which might be levied? If these provisions, carefully made for the safety and protection of the rights of the Indian owner, signify nothing as against the power of state interference to despoil him of his property, then the treaty had better have provided at once that the land should belong to the first speculator in tax titles who should bid at the sale. It was clearly not intended by the federal government that the land should be thus forfeited and lost; and the power of that government, as we have seen, is supreme over the subject. But, not to dwell longer upon this point, enough has been said to suggest the difficulties which must ensue from that construction of the statute which would make the land taxable, and so to corroborate the construction which is above given.

If it be not a conceded proposition, it should be, that the restriction upon the patentee's power of alienation without the permission of the President, was personal to the patentee. It was so both by the language of the treaty and of the patent, and there was no obstacle to the conveyance of the land by the heirs of the patentee in the same manner and under like circumstances as the lands of other owners might be conveyed.

The remaining questions relate to the validity of the proceedings in the probate court of Ramsay county, Minnesota, for the appointment of a guardian of the persons and estates of the minor heirs, Henry and Therese Grignon, and to the sufficiency of the evidence of identity and heirship of the boy, Henry. No objection whatever is taken to the regularity of the proceedings in the county court for the county of Dane, in this state, by whose license and order the lands were sold. That court had jurisdiction of the subject matter, and could authorize and direct the sale of the real estate of the wards within the county. All its proceedings were formal and regular, the proper notices given, the lands inventoried and appraised, and the sale ordered and duly affirmed. · Those proceedings were had and conducted to a sale and conveyance of the land upon the application of the foreign guardian appointed

by the probate court of Ramsay county, an authenticated copy of whose appointment as such guardian was produced and filed in the county court in the manner prescribed by statute. The record of the proceedings in the county court recites that the person making the application, and who was licensed to sell the land, was such guardian, duly appointed.

Under these circumstances, and especially under the operation of the statute of this state, (ch. 127, Laws of 1861 ; 2 Tay. Stats., 1194, § 66), which creates the same presumption in favor of the jurisdiction of the county court, and the validity of its proceedings, when acting in probate, as prevails in favor of the jurisdiction of courts of general jurisdiction and of the validity of their proceedings, it may well be doubted whether anything more was requisite to be shown to constitute a *prima facie* valid sale than the recorded proceedings of the Dane county court. The record of those proceedings, regular on their face, created a presumption of jurisdiction in all respects sufficient to sustain the sale until the contrary was shown. Enough appeared on the face of the proceedings to call on the court to act. Papers purporting to be foreign letters of guardianship were presented, which was sufficient to authorize the court to proceed to determine whether they were such letters or not, and whether duly issued, and to allow them to be filed; and also to determine whether the person presenting them was the guardian therein named. The court was likewise called upon to adjudicate as to the identity of the persons therein named as the wards, and as to their interest in and ownership of the estate proposed to be sold. All these questions were necessarily considered and adjudicated by the county court in the course of its proceedings, and the record of that court, when produced on the trial below, was *prima facie* evidence of them.

If this view be correct, as it would clearly seem to be, then the question presented is, whether the *prima facie* effect of the record and proceedings in the county court was overcome by other evidence produced and given on the trial. The burden

of showing that the foreign letters of guardianship were void, rested upon the parties attacking the validity of the sale on that ground. A transcript of the proceedings of the foreign court, together with an authenticated copy of the letters of guardianship, was given in evidence. That transcript and those letters are relied upon as furnishing evidence to impeach the *prima facie* jurisdiction of the county court, and to show the invalidity of its proceedings. It is said that, to have authorized the probate court of Ramsay county to appoint a guardian, it must have appeared that the alleged wards were residents of the county at the time of appointment, or otherwise the court was without any jurisdiction, and the appointment void. It is objected that the record of proceedings in that court does not show that they were such residents. This is a mistake. It is true, the record of the petition, order of appointment, etc., does not recite the fact; but the letters of guardianship, which were also of record, do do so, and this is sufficient. The rule would be intolerable, if, to sustain his title, the purchaser at one of these foreign guardian's sales was required not only to substantiate the correctness of the proceedings of our own court, but likewise to go behind the record of the proceeding in the foreign court, and affirmatively to prove and establish the existence of every fact necessary to give that court jurisdiction, whether such fact were recited in the record or not. Even if the record contained no recital, the better rule in such case would seem to be to cast the burden of proof upon the party asserting the want of jurisdiction. No purchaser could ever protect himself, and no sale ever be made to the advantage of the parties in interest, if the rule were otherwise. The foreign guardianship record, if fair on its face and disclosing no facts showing a want of jurisdiction, must be taken as *prima facie* authoritative and valid. The foreign record here, therefore, showed nothing to impeach the jurisdiction of the court making the appointment, and, consequently, nothing to impeach the jurisdiction of the county court of this state by

which the sale was directed.   Upon the face of both records it must be assumed that the county court had jurisdiction, not only of the subject matter of the proceeding, but also of the persons of the minor heirs themselves, by representation through thier legally appointed guardian.

But it is furthermore objected, that the county court of Ramsay county was without jurisdiction, because it appears that the alleged wards were persons of Indian blood, and were members of and belonged to an Indian tribe, which was known and recognized as a distinct nation or people.   The power and jurisdiction to appoint guardians do not depend at all upon the citizenship or nationality of the wards.    The courts of one country may appoint guardians for persons resident therein, who are citizens of another country, or who have a different nationality.   So the courts of one state or country may appoint guardians for the estate or property, situate therein, of persons residing in any foreign state or country, and who are citizens thereof.   We have statutes in this state based upon this principle, and it is one which is everywhere acquiesced in and adopted.

It follows from these views that the judgment of the circuit court should be affirmed.

By the Court.—Judgment affirmed.