Hancock *et al* v. Mutual Trust Co. *et al.*

No. 631.   Opinion Fi'ed July 13, 1909.

(103 Pac. 566.)

1.   INDIANS—Allotment—Conveyance by Heirs. Lands allotted (homestead and surplus) under the provisions of section 22, c. 1362, 32 Stat. 641, approved July 1, 1902, in the name of a deceased member of the Croctaw Tribe of Indians, are alienable by his heirs after lawful selection, prior to the lapse of one, three, or five years, and prior to the issuance of certificate or patent.

(Syllabus by the Court.)

*Error from District Court, Carter County; S. H. Russell, Judge.*

Action by Francis Hancock and Bertie Ebonowatubbee against the Mutual Trust Company and J. E. Hamilton. Judgment for defendants, and plaintiffs bring error. Affirmed.

*Thos. Norman* and *W. N. Redwine,* for plaintiff in error, citing: *Wallace v. Adams,* 74 C. C. A. 540; *Stevens v. Smith,* 77 U. S. 321; *Taylor v. Brown,* 147 U. S. 641; *Goodrum v. Buffalo,* 162 Fed. 817.

*W. D. Gibbs* and *Ledbetter & Bledsoe,* for defendants in

error, citing: *Godfrey v. Iowa Land & Trust Co.,* 21 Okla. 293, 95 Pac. 792; *McWilliams Inv. Co. v. Livingston,* 22 Okla. 884, 98 Pac. 814; *Western Inv. Co. v. Tiger,* 21 Okla. 630, 96 Pac. 602; *Indian Land & Trust Co. v. Fears,* 22 Okla. 681, 98 Pac. 904; Statutes of Arkansas, secs. 2522, 2531, 2543; *Barnett v. Bank,* 98 U. S. 555; *Shultis v. McDougal,* 162 Fed. 332; *Jones v. Meehan,* 175 U. S. 1; *Clark v. Lord,* 20 Kan. 390; *Farrington v. Wilson,* 29 Wis. 383; *Love v. Pamplin,* 21 Fed. 755; *Briggs v. McClain,* 23 Kan. 1045.

DUNN, J. October 1, 1905, Simon Ebonowatubbee, a full-blood Choctaw Indian, died. He was duly enrolled as a member of that tribe of Indians at the time of his death, and entitled to an allotment in accordance with the provisions relative thereto contained in what is commonly known as the "supplementary treaty," chapter 1362, 32 Stat. 641, approved July 1, 1902. At the time of his death he had not selected his allotment, and hence there had not been issued to him either a certificate or patent therefor. A few days after his death an administrator was appointed over his estate, who, in due course, selected, filed upon, and had allotted to the said deceased in his name, a tract of land as and for his allotment. He left surviving him Bertie Ebonowatubbee, his wife, and Francis Hancock, the plaintiffs in the court below, and also one John King, who inherited his property under the terms of section 22 of the treaty aforesaid. King promptly sold his interest in the land, and Bertie Ebonowatubbee and Francis Hancock, parties hereto, also in the latter part of October, 1905, made, executed, and delivered a deed to the land, but on the 22d day of November, 1906, filed their complaint in equity to have the same set aside, alleging, among other grounds, that the said land was not alienable by them at the time the deed was executed; there being at that time neither certificate nor patent issued for said allotment. To this part of the complaint the defendants filed a demurrer, which was on the 22d day of June, 1908, by the court sustained, holding:

"That the demurrer should be sustained as to all that part of

plaintiff's amended complaint which alleges that the lands in controversy were inalienable at the time of the execution of the deed, which deed was executed before the issuance of the allotment certificate and patent to said lands, but subsequent to the selection of same as the allotment of Simon Ebonowatubbee."

Whereupon complainants, electing to stand upon the allegations of their complaint, and refusing to plead further in the cause, gave notice of appeal to the Supreme Court, which in due course was had, and the case is now before us on petition in error and case made.

Two questions are raised by counsel for plaintiff in error: First, did the lower court err in holding that the land allotted in the name of the deceased allottee of the Choctaw Nation was alienable by the heirs of such allottee after lawful selection but prior to the issuance of a certificate of allotment or of patent to the land? Second, did the lower court err in holding that the surplus land lawfully allotted a member of the Choctaw Nation was alienable immediately on the death of the allottee and before the expiration of one, three, and five years, and without reference to whether a certificate or patent had theretofore been issued?

These questions require consideration at our hands of the following sections of the treaty referred to:

"Sec. 11. There shall be allotted to each member of the Choctaw and Chickasaw Tribes, as soon as practicable after the approval by the Secretary of the Interior of his enrollment as herein provided, land equal in value to three hundred and twenty acres of the average allottable land of the Choctaw and Chickasaw Nations, and to each Choctaw and Chickasaw freedman, as soon as practicable after the approval by the Secretary of the Interior of his enrollment, land equal in value to forty acres of the average allottable land of the Choctaw and Chickasaw Nations; to conform, as nearly as may be, to the areas and boundaries established by the government survey, which land may be selected by each allottee so as to include his improvements. For the purpose of makmaking allotments and designating homesteads hereunder, the forty-acre or quarter-quarter subdivisions established by the government survey may be dealt with as if further subdivided into four equal parts in the usual manner, thus making the smallest

legal subdivision ten acres, or a quarter of a quarter of a quarter of a section.

"Sec. 12. Each member of said tribes shall, at the time of the selection of his allotment, designate as a homestead out of said allotment land equal in value to one hundred and sixty acres of the average allottable land of the Choctaw and Chickasaw Nations, as nearly as may be, which shall be inalienable during the lifetime of the allottee, not exceeding twenty-one years from the date of certificate of allotment, and separate certificate and patent shall issue for said homestead.

"Sec. 13. The allotment of each Choctaw and Chickasaw freedman shall be inalienable during the lifetime of the allottee, not exceeding twenty-one years from the date of certificate of allotment.

"Sec. 14. When allotments as herein provided have been made to all citizens and freedmen the residue of lands not herein reserved or otherwise disposed of, if any there be, shall be sold at public auction under rules and regulations and on terms to be prescribed by the Secretary of the Interior, and so much of the proceeds as may be necessary for equalizing allotments shall be used for that purpose, and the balance shall be. paid into the Treasury of the United States to the credit of the Choctaws and Chickasaws and distributed *per capita* as other funds of the tribes.

"Sec. 15. Lands allotted to members and freedmen shall not be affected or incumbered by any deed, debt, or obligation of any character contracted prior to the time at which said land may be alienated under this act, nor shall said lands be sold except as herein provided.

"Sec. 16. All lands allotted to the members of said tribes, except such land as is set aside to each for a homestead as herein provided, shall be alienable after issuance of patent as follows: One-fourth in acreage in one year, one-fourth in acreage in three years, and the balance in five years; in each case from date of patent, provided, that such land shall be alienable by the allottee or his heirs at any time before the expiration of the Choctaw and Chickasaw tribal governments for less than its appraised value."

It is the claim of plaintiffs under the foregoing sections that, prior to the issuance of either a certificate of allotment or of a patent, or both, the allottee has no title, and that, under the

plain terms of the enactment, he is not permitted to alienate any of his lands prior to the date of the patent, and the argument is made that the limitation contained in the foregoing sections not only applies to the living members · of the tribe, but that it is equally applicable to the heirs of the deceased members; that is, those whose names appeared upon the rolls and who died subsequent to the ratification of the agreement and before receiving their allotments. Section 22 of the same treaty provides as follows:

"If any person whose name appears upon the rolls, prepared as herein provided, shall have died, subsequent to the ratification of this agreement and before receiving his allotment of land, the lands to which such person would have been entitled if living shall be alloted in his name, and shall, together with his proportionate share of other tribal property, descend to his heirs according to the laws of descent and distribution as provided in chapter forty-nine of Mansffeld's Digest of the Statutes of Arkansas: Provided, that the allotment thus to be made shall be selected by a duly appointed administrator or executor. If, however, such administrator or executor be not duly and expeditiously appointed, or fails to act promptly when appointed, or for any 'other cause such selection be not so made within a reasonable and practicable time, the commission to the Five Civilized Tribes shall designate the lands thus to be allotted."

To our minds the sections of the treaty which touch upon the subject naturally fall into three divisions, to wit, the provisions included in the sections which we have first above noted, being sections from 11 to 16, inclusive, which particular sections relate to the living people who would personally participate in the disposition of the lands and properties of the tribes; and, second, those subdivisions embraced in the three sections 19, 20, and 21, which relate to criminal offenses carved out of violations of the different portions of the treaty, and which fix the punishment therefor, and it is to be noted that not until both of these classes or elements are provided for, and the subjects therein dealt with concluded, that we find the treaty dealing with the third subdivision, which relates solely to the lands and property of those

who were not in being at the time the allotment was made, who are provided for in section 22.

The general purpose of the entire act is easily gathered from its history and terms. The Congress of the United States and the members of the different tribes clearly foresaw that the increasing pressure of white people surrounding these nations, crowding over and intermingling with them, rendered a further continuance of their qualified tribal independence of the government of the United States not only impracticable and probably impossible of accomplishment, but also that the friction occasioned by an effort to continue it would work to the detriment of all parties. Out of this situation grew the conviction that it would be wiser and more conducive to the best interests of all to divide the national wealth among the children of the tribes who were then living and among the heirs of those whose names were upon the roll on a day certain. When this was done, and each had received his portion, then would come a dissolution of the ties which had bound them together as a government, and each with his patrimony would go his separate way. Under the old *regime,* when a member of the nation died, his interest in the property of the nation went back to the entire body of the people; but this was not to be under the treaty into which they entered, and which is now before us, for, under it, a roll of the membership of the nation and those who were entitled to participate in its assets was provided for. Recognition of the general inability of the individual members to at once successfully cope in a business way with many of the people among and surrounding them was taken by providing that all of those who were living, and who under the treaty personally took their allotments, were held by virtue of the terms of the act to be restricted in their right of alienation, and to take the land subject to this restriction. This condition and the reason for it are well stated in the case of *Jackson v. Thompson et al.,* 38 Wash. 282, 80 Pac. 454, wherein the Supreme Court of that state, speaking through Mr. Justice Dunbar, said:

"The Indians are wards of the government. These ar-

rangements and provisions are provisions in their interest and by their consent, as indicated in the solemn treaties executed. The government, from the necessities of the case, in consideration of the inexperience of the Indians, was compelled to insert these provisions in deeds which it issued to them to prevent them from becoming the prey of sharpers and speculators, who would, for an insufficient consideration, obtain their lands, the ultimate result being that the Indians would become pensioners upon the government; and the mutual interests of the Indians and the government demanded some such regulations."

And the same policy was likewise recognized by the Circuit Court of Appeals of the Eighth Circuit in the case of *Beck v. Flournoy Live-Stock & Real Estate Company,* 65 Fed. 30, 34, 12 C. C. A. 497, 501, wherein Justice Thayer, who prepared the opinion for the court, said:

"These limitations upon the power of the Indians to sell or make contracts respecting land that might be set apart to them for the individual use and benefit were imposed to protect them from the greed and superior intelligence of the white man. Congress well knew that if these wards of the nation were placed in possession of real estate, and were given capacity to sell or lease the same, or to make contracts with white men with reference thereto, they would soon be deprived of their several holdings; and that instead of adopting the customs and habits of civilized life and becoming self-supporting, they would speedily waste their substance, and very likely become paupers. The motive that actuated the lawmaker in depriving the Indians of the power of alienation is so obvious, and the language of the statute in that behalf is so plain, as to leave no room for doubt that Congress intended to put it beyond the power of white men to secure any interest whatsoever in lands situated within Indian reservations that might be allotted to Indians."

The foregoing discussions are equally applicable to the people who were required to act under the treaty in question, and the necessity for the protection mentioned by the courts in the cases which we have noticed was recognized by Congress and the representatives of the tribes in the preparation of this treaty. Three hundred and twenty, or even 160, acres of land of the character referred to in this treaty and embraced within these nations is,

in the county, a munificent competency. It is sufficient to abundantly protect every possessor of it, should he retain it, as long as he lives, and to leave a bountiful legacy to those who come after him. A citizen of this nation, with such a possession and resource, would never need feel want or distress. He would not become a charge or a subject of charity. But the reasons which prompted the lawmakers to protect him in this holding were altogether wanting when it came to the question of protecting those whose names were on the roll, but who died before receiving an allotment. If the heirs of those people were members of the tribe, they in their own allotments were amply provided for. If the heirs of those people were not members of the tribe, there existed no necessity, occasion, or policy requiring any restriction on the sale of their lands.

The conclusion reached, based on the foregoing observations, which in a way relate generally to the policy of the law as gathered from it and the conditions 'surrounding its adoption, rather than to its specific terms, are in our judgment fully sustained when the exact literal language of the statute is scanned and weighed.

Section 27 provides for the making of rolls of the Choctaw and Chickasaw citizens, and the Choctaw and Chickasaw freedmen by the commission to the Five Civilized Tribes, and section 28 provides that the names of all persons living on the date of the final ratification of the agreement, entitled to be enrolled, shall be placed upon the rolls made by the commission, and that no person intermarried thereafter to a citizen shall be entitled to enrollment or participation in the property of the tribe. In these sections, then, there is fixed absolutely (except a class not necessary to here notice) the identity of the persons among whom the property of the tribe is to be parceled or apportioned. By section 11, as is seen, it is provided that there shall be allotted to each member of the tribe, after the enrollment just noticed, land equal in value to 320 acres of average allottable land, and to each freedman whose name appeared on the rolls provided for 40 acres of the same character of land. In reference to the land of

the members, section 12 provides that, at the time of the selection of his allotment, each member shall designate as a homestead land equal in value to 160 acres, and on the alienation of this land there is placed this specific restriction: That it shall not be alienated during the lifetime of the allottee, which limitation, however, is modified by the further provisions that this shall not continue longer than 21 years from the date of the certificate. So that, to our minds, from the language, it is clear that if the member, with his designated homestead, lives so long as 21 years from the date of the certificate, during that period he cannot lawfully sell this portion of his allotment; but to us it appears equally clear that, should he die even the next day after receiving his certificate to his homestead allotment, his heirs then (so far as this act is concerned) might sell the same free from any restriction on its alienation. Section 13 sets forth the restriction which exists upon the alienation by a freedman of the land which he receives under this treaty, and it is to be noted that the language contained in section 12, relating to the restriction on alienation by a member, of his homestead allotment, is identical in terms with the language used in section 13, relating to the restriction upon the alienation of land allotted to the freedmen. In each of them it is provided that the same "shall be unalienable during the lifetime of the allottee not exceeding twenty-one years from the date of the certificate of allotment." To each of these allottees, then, is the same law with reference to alienation made applicable. His death would remove this restriction from the alienation of the land by his heirs, and a lapse of 21 years would remove it as to himself.

Now, if the heirs of a member of the tribe, as to his homestead, and the heirs of a freedman, may sell the lands allotted to their ancestor, immediately on his death, what possible reason can be assigned, or where is the language in the act which would preclude an immediate alienation by the heirs of those "persons" (which word includes members, citizens, and freedmen) provided for under section 22, who never in fact selected their allotments,

.but whose allotments were selected solely for the benefit of and in the interest of the heirs. To our minds both are wholly wanting. Nor in our judgment is this construction in any wise modified or limited by the terms of sections 15 and 16. To our minds it is reasonable to say and hold that lands or other property coming to an individual either by descent or purchase comes to him with no restriction upon his rights to dispose of them, except the specific restriction with which their title is by clear terms burdened. This rule we think applicable to the lands which are granted to these people under this treaty. If there is no specific language fixing a restriction, and no language from which an implication thereof may be plainly derived, then, in our judgment, none ought to be held to exist. Section 15 provides generally against the incumbrances of lands allotted to members and freedmen, by any deed, debt, or obligation prior to the time when the land can be alienated, which would necessarily carry with it the converse of the proposition, that these lands could be incumbered after the time at which they could be alienated. The last clause of this section provides: "Nor shall said lands be sold except as herein provided." Section 16, immediately following, to our minds has specific reference to the clause which we have just quoted, for it provides that, except the homestead, all lands allotted to the members of the tribes may be alienated in certain proportions in one, three, and five years after the date of patent. The proviso contained in that section is "that *such* land shall not be alienable by the allottee or his heirs at any time before the expiration of the Choctaw and Chickasaw tribal governments for less than its appraised value." The first portion of this section in our judgment relates solely to the surplus lands, and not to the homestead of living members, and the proviso relates solely to the price to be received, and in no other way restricts or modifies the section.

The practice under the requirements of the treaty, as is shown by the record in this case, seems to have been to separate the lands of the members of the tribe into homesteads and surplus, even where those members were persons who came within the

provisions of section 22, and who in fact were dead, and to whom the word "homestead," in its generally accepted use, could in no wise apply. The question of whether or not the restrictions contained in section 16, providing for the sale of the surplus lands allotted to members in one, three, and five years, to be made only after the expiration of such periods *from the date of patent*, referred to the surplus taken by the members who were included in the term "persons" of section 22, presents a proposition of perhaps a little greater difficulty than any other in the case. Several considerations prompt us to hold, however, that the limitation referred to does not apply to this land. First, it will be noted that the section under consideration falls within that portion of the act where the scheme for the taking, holding, and disposing of the property of living persons is worked out, and it seems to us that this particular section was made without even a remote reference to section 22, or the land taken thereunder, but solely with reference to its own terms and to the sections of the act which had preceded it, and, as we have heretofore seen, the heirs of a deceased enrolled freedman could immediately sell his land without any restrictions, and the homestead of a deceased member could at once be sold by his heirs. In view of these considerations, then, it seems to us that it would be irrational and absurd to hold that the surplus would bear a restriction. To say so would be to hold that a homestead, which could not be sold for 21 years if the allottee lived, was free and clear in the hands of the heirs while the surplus which the allottee could sell in one, three, and five years would, in the hands of the same heirs, still carry this limitation upon a right to sell. Another thought which leads us to this same conclusion is that section 22 provides for the allotment in the name of the deceased person, whose name was on the rolls, of the land to which he would have been entitled, which, with his share of the other property, descended to his heirs, not under any tribal or federal act containing recognition of the terms of this treaty, but it is provided that the heirs

shall take under the terms of a separate and specific statute, to wit, the laws of descent and distribution as provided in chapter 49 of Mansfield's Digest of the Statutes of Arkansas. These laws contain no restriction on alienation, and the rights of the heirs under them, being recognized by this treaty, carried the property to them free, clear, and unincumbered.

Furthermore, as we have seen, it cannot be said there is within the language of the section itself any specific restriction, and restrictions on the alienation of real property ought not to fasten their grip on it by implication, unless there are words in the act which would seem to plainly require it. Where the reason of the rule fails, and there is no affirmative language to sustain it, certainly the rule ought to go with it. The application of particular provisions of a statute is not to be extended beyond its general scope and object, unless such extension is manifestly designed. In *Estate of Benjah Ticknor,* 13 Mich. 44, the heirs, in the absence of a will, were entitled to the decedent's property immediately upon his death. In the case at bar it is true no certificate or patent had issued; but, as Mr. Justice Field said in the case of *Stark v. Starr,* 6 Wall. 418, 18 L. Ed. 925:

"The right to a patent, once vested, is treated by the government when dealing with the public lands as equivalent to a patent issued. When in fact the patent does issue, it relates back to the inception of the right of the patentee, so far as it may be necessary to cut off intervening claimants."

Other authorities, which have been examined and found helpful to us in the consideration of this question, are: *Indian Land & Trust Company v. Fears et al.,* 22 Okla. 681, 98 Pac. 904; *Clark v. Lord et al.,* 20 Kan. 390; *Farrington v. Wilson et al.,* 29 Wis. 383; *Shulthis v. MacDougal* (C. C.) 162 Fed 331; *Jones v. Meehan,* 175 U. S. 1, 20 Sup. Ct. 1, 44 L. Ed. 49.

From the foregoing it will be seen we conclude the lower court did not err in holding that lands allotted (homestead and surplus) under the provisions of section 22, c. 1362, 32 Stat. 641, approved July 1, 1902, in the name of a deceased member of the Choctaw Tribe of Indians, are alienable by his heirs after

lawful selection, prior to the lapse of one, three, or five years, and prior to the issuance of certificate or patent, and the judgment is, accordingly, affirmed.

Kane, C. J., and Turner, J., concur; Williams and Hayes, JJ., not sitting or participating.