## PARKINSON v. SKELTON.

No. 1120.   Opinion Filed November 16, 1912.

(128 Pac. 131.)

1. **INDIANS—Lands—Conveyance—"Allottees."**  The word "allottees," as used in Act April 21, 1904, c. 1402, 33 St. at L. 204, refers to the parties to whom an allotment is made, and not to their heirs; and where the allottee under the said act would have been authorized to alienate his land, had he lived, the same, on his death, was alienable by his heirs, without reference to their blood.

2. **SAME—Homestead.**  B., a white man, duly enrolled as a member of the Creek Tribe of Indians, received his allotment, for which a certificate was duly issued, and died intestate, and without issue, in the fore part of the year 1900.  Thereafter patent conveying the said allotment, homestead and surplus, was duly issued to his heirs.  Held, that the homestead quality did not attach, and if any restrictions existed on alienation of any of said land they were removed by Act Cong. April 21, 1904, c. 1402, 33 St. at L. 204; and the heirs were thereafter authorized to sell and convey the same.

(Syllabus by the Court.)

*Error from District Court, Okmulgee County;*
*John Caruthers, Judge.*

Action by L. S. Skelton against James Parkinson.  Judgment for plaintiff, and defendant brings error.  Reversed and remanded, with instructions.

*W. W. Wood,* for plaintiff in error.

*Stanford & Cochran* and *J. C. Stone,* for defendant in error.

DUNN, J.   This case presents error from the district court of Okmulgee county.   September 16, 1908, L. S. Skelton, defendant in error, as plaintiff, filed in the office of the clerk of the district court of that county his petition against James Parkinson, as defendant, plaintiff in error here, and one Greely McIntosh.   No service was had upon the latter, and the action as to him has been abandoned.   The purpose of the suit was to quiet title in certain lands described in the petition, situated in Okmulgee county, the title and possession of which plaintiff claimed.   To the petition defendant filed answer, setting out in detail the different conveyances by and through which both par-

ties claim title, and asked for judgment in his favor. To this answer the plaintiff filed a demurrer, which was by the court sustained, and the defendant, relying upon the defenses in his answer, has lodged the cause in this court for review.

The averments of the answer challenged by the demurrer present substantially the following state of facts: One C. C. Belcher, a white man, adopted and enrolled as a citizen of the Creek Tribe of Indians, died some time in the early part of the year 1900, without issue, and intestate. Prior to his death, the lands described in the petition and answer had been selected by him as his allotment, and there had been issued to him a certificate therefor. He left surviving him as his sole heirs certain mixed and full blood Indians, enrolled members of the tribe, to whom, as heirs, patents, homestead and surplus were subsequently issued for decedent's land. In reference to the sale and transfer of this property by these heirs, out of which this controversy arises, it is sufficient to say that deeds were duly executed and delivered by them to the defendant, Parkinson, in March, 1905; the land being purchased and conveyed under the theory that the act of April 21, 1904 (33 St. at L. 204), had removed the restrictions upon its alienation, and hence that title could be conveyed. The answer recites with particularity the sale and conveyance of the same land, made by the same parties, to the plaintiff, Skelton, which he took by a series of conveyances, the first of which was executed in May, 1906, and the balance during the years of 1907 and 1908. This purchase and sale of the land was made under the theory that there existed restrictions on its alienation, and that the act above referred to did not release the restrictions, and that the title, notwithstanding the conveyance to defendant, Parkinson, still remained in these heirs, which land, by reason of the expiration of the five-year period contained in section 7 of the act of March 1, 1901 (31 St. at L. 863, c. 676), known as the original agreement, and the same provision contained in the act of June 30, 1902, known as the supplemental agreement (32 St. at L. 500, c. 1323) had become subject to sale and transfer, and that the heirs were qualified to convey it.

It will thus be seen that all parties assume that the land was restricted; and hence the construction of the act of April 21, 1904 (33 St. at L. 204), and the determination of the question of from whom, and to what extent, it removed restrictions, is presented.

The second proposition grows out of the homestead allotment, the claim being made that the 40 acres denominated a homestead should not be regarded as being within the purview of section 7 of the act of March 1, 1901 (31 St. at L. 863), for the reason that none of the land had the character of homestead land and it occupied the same status as the surplus allotment, and that the act of April 21, 1904 (33 St. at L. 204), removed any existing restrictions from the entire allotment.

The propositions here presented will be treated in their order, and are discussed and decided on the theories presented by counsel in their briefs.

As above noted, there is involved herein lands denominated both surplus and homestead. We will first deal with the so-called surplus land, leaving the question of the homestead for a subsequent paragraph.

That portion of section 7 of the act of March 1, 1901 (31 St. at L. 863), being the first Creek agreement, which relates specifically to the question now before us, reads as follows:

"Lands allotted to citizens hereunder shall not   *   *   *   be alienable by the allottee or his heirs at any time before the expiration of five years from the ratification of this agreement, except with the approval of the Secretary of the Interior."

Section 16 of the Act of Congress of June 30, 1902 (32 St. at L. 503), known as the supplemental agreement, stripped to present those portions pertinent to this inquiry, reads as follows:

"Lands allotted to citizens shall not   *   *   *   be alienated by the allottee or his heirs before the expiration of five years from the date of the approval of this supplemental agreement, except with the approval of the Secretary of the Interior."

Assuming that the foregoing acts placed restrictions on this land in the hands of the heirs, it is evident that if they were in force at the time of the making of the deeds in question in 1905

the heirs would have lacked the power to alienate; for it is not claimed that the Secretary of the Interior gave his approval to any of these deeds. The restrictions therein imposed, however, it is contended, were removed, and these heirs rendered qualified to alienate at least the surplus land. That portion of the act of April 21, 1904 (33 St. at L. 204), relied upon and pertinent and necessary for our consideration is found in the miscellaneous section, and reads as follows:

"And all the restrictions upon the alienation of lands of all allottees of either of the Five Civilized Tribes of Indians who are not of Indian blood, except minors, are, except as to homesteads, hereby removed. * * * "

Considering the proposition under discussion: From what and whom were restrictions on alienation removed? Clearly from lands, not homestead (where it existed), of allottees who were not minors or of Indian blood. Who was an allottee? Mr. Bledsoe, in his work on Indian Land Laws, at section 37, says:

"The word 'allottee' has been uniformly construed to mean a person who has selected and has set apart to him the land he desires to take in allotment."

And defining the word as the same is used in this particular treaty, at section 52, *Id.,* he says:

"It is the restriction upon the alienation of lands of *allottees* that is removed. The word 'allot' means to set apart a thing to a person as his share. Anderson, Law Dictionary, p. 51; 2 Cyc. 134."

He further says in the same section:

"It cannot well be urged that a member of the tribe becomes an allottee until he selects his allotment. Prior to that time he is not an allottee; subsequent to that time he is, as to the land set apart to him, an allottee."

If the foregoing definitions of the word "allottee" are correct, and we believe them to be, then Belcher, the decedent, not of Indian blood, was the allottee in this case, and not his heirs.

The recent case of *U. S. v. Jacobs,* 195 Fed. 707, by the Circuit Court of Appeals of the Eighth Circuit, dealt with this act, and held that the adult heirs of a deceased minor Creek freedman could alienate. It is to be observed, however, that in

that case the heirs were the allottees, and not the deceased minor. The minor, Pearlie Jacobs, was held to have been living on the 1st day of April, 1899, and entitled to an allotment, but had not selected it; nor had it been selected for her. Hence the same was not confirmed, as provided for in section 6 of the act of March 1, 1901 (31 St. at L. 863), but was taken under and by virtue of the terms of the second paragraph of section 28 of the same act; and the land to which she would have been entitled, had she lived, descended to her heirs, and was directly allotted and distributed to them. Hence they were the allottees. This was not true in the case at bar. Belcher, the deceased white man, was the allottee, because he was the one to whom the allotment was made. On the question of whether the act released the restriction as to heirs, Judge Munger, who prepared the opinion in that case, said:

"It is insisted upon the part of the government that the defendants could not be *bona fide* purchasers, because, under the law, the heirs of Pearlie Jacobs were prohibited from alienating the land for a period of five years. They argue that by section 16, above quoted, the prohibition upon alienation before the expiration of five years was a prohibition against alienation by the allottee or his heirs, and as the term 'heirs' was not used in the act of April 21, 1904, removing the restrictions, that the restriction was only removed so as to authorize the allottee to make a conveyance. We do not so construe the statute. The act of April 21, 1904, above quoted, says: 'And all restrictions upon the alienation of lands of allottees, except minors, are removed.' This was not a removal of the restriction upon alienation by the allottee only, but was general and applied to allottees or heirs of allottees, except in cases only of minors; and no claim is made that any of the heirs of Pearlie Jacobs were minors. Hence it is clear that there was no restriction upon the alienation by them."

This case is not exactly in point in the case at bar, however; for the only question was: Could the adult allottee heirs not of Indian blood alienate? On this we think there can be no doubt; and, while we confess there may be room for argument, we feel confident that when the law lifted the restrictions, if any existed, from the land in this case, it did not intend to continue the disability of exercising the right of alienation on those

into whose hands it fell. The heirs took it with just such rights and privileges as the ancestor held.

The yardstick used by Congress to measure the capacity of these people to enjoy the right to alienate their lands was and has been blood and age. Those of Indian blood and minors have received its especial care. It was doubtless not considered likely that full and half blood heirs would inherit from a white man as an allottee, or else it was deemed to be too infrequent to require notice; hence no provision was made for it. So it happens that these Indian heirs are authorized to sell the land they have inherited from their white ancestor.

Under this construction, also, it doubtless sometimes happened that freedmen and white people fell heir to lands of which Indians of the blood had been the allottees, and the incongruous situation was presented of their being, under the act of 1904, fully endowed with authority to sell their own allotments, yet could not sell the land they inherited. There could be no reason to support such a situation.

Judge Amidon, in the case of *Shultis v. McDougal et al.* (C. C.) 162 Fed. 331, states that it was never the intent of either the tribe or of the government to grant to parties having a kinsman who had died additional lands as a bounty. There could be no object or purpose in that. See, also, *Hancock et al. v. Mutual Trust Co. et al.*, 24 Okla. 391, 103 Pac. 566, and the case of *Mullen et al. v. United States*, 224 U. S. 448, 32 Sup. Ct. 494, 56 L. Ed. 834, decided by the Supreme Court of the United States, April 15, 1912.

So two years later Congress passed the act of April 22, 1906 (34 St. at L. 145, c. 1876), section 22 of which reads:

"That the adult heirs of any deceased Indian of either of the Five Civilized Tribes whose selection has been made, or to whom a deed or patent has been issued for his or her share of the land of the tribe to which he or she belongs or belonged, may sell and convey the lands inherited from such decedent; and if there be both adult and minor heirs of such decedent, then such minors may join in a sale of such lands by a guardian duly appointed by the proper United States Court for the Indian Territory. And in case of the organization of a state or territory, then by a proper court of the county in which said minor or minors may

reside or in which said real estate is situated, upon an order of such court made upon petition filed by guardian. All conveyances made under this provision by heirs who are full-blood Indians are to be subject to the approval of the Secretary of the Interior, under such rules and regulations as he may prescribe."

The terms of this act confirm us in the conclusion to which we have arrived in holding that the heirs of allottees not of Indian blood could alienate. Congress virtually says that "by the act of 1904 we permitted the adult heirs of all allottees *not* of Indian blood to alienate, and now by this act of 1906 we permit the adult heirs of those allottees who *are* of Indian blood to alienate." For us to hold otherwise would be to ignore every rule and policy adopted and acted on by Congress since it began to deal with these tribes and their lands. To hold otherwise would be to say that Congress had provided that the heirs of deceased Indian allottees could alienate their lands, but the heirs of deceased white and freedmen members of these tribes could not. Such a conclusion, in our judgment, is not tolerable; hence, for the reasons stated, we reject it.

The remaining question relates to the so-called homestead. The decedent, to whom a certificate of allotment was issued, died without having selected a homestead from his allotment; but a patent was issued, in which a certain portion was so denominated. Section 7 of the original Creek agreement of March 1, 1901 (31 St. at L. 863), reads as follows:

"Each citizen shall select from his allotment forty acres of land as a homestead, which shall be nontaxable and inalienable and free from any incumbrance whatever for twenty-one years, for which he shall have a separate deed, conditioned as above: Provided, that selections of homesteads for minors, prisoners, convicts, incompetents, and aged and infirm persons, who cannot select for themselves, may be made in the manner herein provided for the selection of their allotments; and if, for any reason, such selection be not made for any citizen, it shall be the duty of said commission to make selection for him.

"The homestead of each citizen shall remain, after the death of the allottee, for the use and support of children born to him after the ratification of this agreement, but if he have no such issue, then he may dispose of his homestead by will, free from limitation herein imposed, and if this be not done, the land shall

descend to his heirs, according to the laws of descent and distribution of the Creek Nation, free from such limitation."

As Belcher died prior to the passage of this law, he could not, and did not, act under it in making any selection of a homestead, and the question arises: Of what force and effect was the selection or denomination of a portion of his allotment as such?

The first paragraph above quoted clearly indicates for whom homesteads were to be selected. Every one therein referred to was a living citizen or allottee—none other. There could be no object in selecting a homestead for a dead man. Nor could there be any object in selecting a homestead for his heirs. If they were allottees, they had homesteads of their own; if they were not, the law was not intended for them or their protection. See the discussion of this proposition in *Hancock et al. v. Mutual Trust Co. et al., supra,* and *Mullen et al. v. U. S., supra.* So we have neither a law nor a reason for a law to support the claim that the allottee, who died prior to the date of this act, had a homestead; and, although a portion of the land may have been so designated, it was without force or effect. The section quoted provides for the selection by the citizen, or, where, for any reason, he could not do so, by the Commission. The homestead portion, it was then provided, should remain, after the death of the allottee, for the use and support of the children born to him after the ratification of the agreement; but if he had no issue he might then dispose of it by a will, free from the homestead limitation, and, dying intestate, the land descended to his heirs, free from such (the 21-year) limitation; the heirs thereby taking the land with the same restrictions upon it as existed upon the surplus. The decedent in the case at bar died before the ratification of this treaty, without issue born thereafter, and the conditions upon which the homestead right became vested never arose, either as to him or his heirs.

A very satisfactory discussion of this question is contained in the case of *Hawkins et al. v. Oklahoma Oil Co. et al.,* 195 Fed. 345, from the Circuit Court of the United States for the Eastern District of Oklahoma, by Judge Campbell. The land

involved in that case was both homestead and surplus. The deceased and heirs were all Creek freedmen; and, while the land was allotted directly to the heirs in 1901 in two separate tracts, one as homestead and the other ·as surplus, and patents in 1904 issued therefor, the reasoning applicable to such a situation is entirely pertinent to the facts in the case at bar. In the opinion it is said:

"In such case, of course, the one allotment of 160 acres vests jointly, in its undivided entirety, in as many different persons as there are heirs to take. No provision is made in such case for their joint selection out of the tract of a 40-acre homestead; and the lack of reason for and the very absurdity of such a provision is manifest from the very statement of the proposition. The practice of the Commission, therefore, in dividing the allotment in such instances into separate tracts, designating one the homestead and the other the surplus, is, in my judgment, without reason or authority; and the fact that it did so does not change the essential status of the land, which must be considered the same as the surplus portion or individual allotments made to living members. The act of April 21, 1904, therefore, removed the restrictions from the land involved in this case."

The so-called homestead, therefore, being received by the heirs with the same limitations upon alienation as existed with reference to the surplus, they were authorized, under and by virtue of the terms of the act of April 21, 1904, to alienate the same; and it therefore follows that the judgment of the trial court must be reversed, which is accordingly done, and the case remanded with instructions to proceed in accordance with this opinion.

The view that there never were any restrictions upon this land has been considered; but as it was not argued by either counsel, and as the result reached would be the same, the theory of the parties has been adhered to and the opinion written from their viewpoint.

TURNER, C. J., concurs. HAYES, J., concurs in the conclusion. WILLIAMS and KANE, JJ., absent, and not participating.